### GEORGE J. MAGNAN, JR. *v.* ANACONDA INDUSTRIES, INC.
### (12132)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued March 8—decision released July 3, 1984

*Anthony M. Fitzgerald,* for the appellant (defendant).

*Gerald P. Dwyer,* with whom, on the brief, was *Kevin T. Gormley,* for the appellee (plaintiff).

SHEA, J. The principal issue presented by this appeal is whether an employee, hired under a contract of indefinite duration, can maintain a cause of action in contract for breach of an implied covenant of good faith and fair dealing based wholly upon a discharge without just cause. Our conclusion is that he cannot.

The plaintiff, George Magnan, brought suit against his former employer of thirteen years, The Anaconda Company (hereinafter Anaconda), alleging in the first count of his amended complaint[1] that he had been discharged in breach of an implied covenant of good faith, and in the second count, that his discharge was in retaliation for his refusal to sign a statement he claimed to be untrue. The jury returned a verdict for Magnan on the first count and for Anaconda on the second count. Anaconda filed a motion for judgment notwithstanding the verdict, which the trial court denied. Thereafter, Anaconda filed this appeal, claiming that the court erred in submitting the first count to the jury because (1) Connecticut law does not recognize the good faith limitation on the power to discharge an at-will employee, and (2) there was insufficient evidence to support the verdict on that count.

The jury could have reasonably found the following facts: During the summer of 1979, Anaconda was informed that certain managerial employees were engaging in illegal activities at the Ansonia plant. Paul A. Palmer, the employee relations manager, and

---

[1] The complaint originally set out three counts, the third count alleging that Anaconda had defamed Magnan. The trial court granted Anaconda's motion for summary judgment on that count. See *Magnan* v. *Anaconda Industries, Inc.,* 37 Conn. Sup. 38, 429 A.2d 492 (1980). The plaintiff has not appealed from that judgment.

Charles F. Ebert, a security investigator, were requested to investigate in order to ascertain whether managerial employees were involved, and if so how many. The investigation focused upon James DellaVolpe, the yard foreman, and Jerry Host, the chief financial officer. Ebert had been told that DellaVolpe had been providing certain managerial employees with company tools, lumber, and gas, all at company expense. Palmer and Ebert also discovered that a refrigerator originally purchased by Anaconda for use in Anaconda's company store had been located at Host's former residence.[2]

Marcel J. Laliberte, a purchasing agent for Anaconda and the original custodian of the refrigerator, told Palmer and Ebert that sometime in February, 1978, DellaVolpe had informed Laliberte that the refrigerator was needed in the boiler house.[3] Laliberte further stated that on the following day DellaVolpe and the plaintiff Magnan, who was working temporarily in the yard under DellaVolpe's supervision, came to the company store and picked up the refrigerator. Laliberte did not know, however, where the refrigerator was eventually delivered.

Aware that they would need Magnan's cooperation in order to establish DellaVolpe's complicity in the theft of the refrigerator, Palmer and Ebert approached Magnan on July 20, 1979, and questioned him concerning its removal. Thereafter, on July 23, Palmer requested that Magnan sign a statement admitting his own complicity in the theft of the refrigerator and implicating

---

[2] By the time the investigation commenced, in 1979, Host had left Anaconda and sold his house.

[3] At trial Laliberte admitted that he had originally lied to Palmer and Ebert when he told them that DellaVolpe had requested the refrigerator for the boiler house. Laliberte stated that DellaVolpe had requested the refrigerator for "the big man" — who Laliberte thought was Jack Dillon, a managerial employee at Anaconda.

DellaVolpe. Palmer, who had drawn up the statement, claimed that the statement was merely a summary of what Magnan had told Palmer and Ebert three days earlier. Magnan disagreed, however, and refused to sign the statement, even though he was told he would not be prosecuted, because he believed the statement did not accurately reflect what he had told Palmer and Ebert.[4] He was suspended from work on July 27 for refusing to sign the statement, and was discharged on August 16, 1979.

# I

For four centuries, and perhaps longer, the law governing the relationship between employer and employee has undergone many revisions. In the sixteenth century a statute enacted in England prohibited an employer from discharging an employee "unless it be for some reasonable and sufficient cause or matter . . . ." Statute of Labourers, 5 Eliz. C. 4 (1562) reprinted in 6 Pickering's Statutes 159-60 (1763).[5] Although the statute was eventually repealed, English courts continued to hold that a contract of employment for an indefinite duration was presumptively for a term of one year; see 1 Blackstone, Commentaries 335

---

[4] In a signed statement prepared by Magnan and his attorney and submitted to Palmer on July 24, Magnan stated that "[a]fter a long period of questioning and in an effort to get out of there [the office] I finally said to Mr. Ebert, 'Well, if you say I did I must have' . . . ."

"After the hours of questioning I stated that I guess I did go there, to Mr. Host's house, with the refrigerator. But I was nervous and I had been questioned for a long time, I did not want to lose my job over something I really did not know anything about, so I said what they wanted to hear in order to get out of there. That was on Friday, July 20, 1979."

We must assume in reviewing the verdict for the plaintiff on the first count that the jury accepted Magnan's version of the events that took place on July 20 and July 23, 1979. *Zarembski* v. *Three Lakes Park, Inc.*, 177 Conn. 603, 604, 419 A.2d 339 (1979).

[5] For a different perspective of the Statute of Labourers and its predecessors see Hartley, "The Framework of Democracy in Union Government," 32 Cath. U. L. Rev. 13, 26-28 (1982) (suggesting that statutory regulation was adopted to counter the early demand for unionization).

(1832); 25 Halsbury's Laws of England 480–81 (3d Ed. 1958); and permitted the employee to maintain a cause of action for breach of the employment contract.[6]

Initial reception of the English rule was unsettled in America,[7] but by the late nineteenth century a vast majority of jurisdictions, relying upon a "busy and perhaps careless . . . American treatise writer,"[8] had adopted the position that an employment contract of indefinite duration was terminable at the will of either

[6] Blackstone stated that the rule was premised "upon a principle of natural equity, that the servant shall serve, and master maintain him, throughout all the natural revolutions of the respective seasons, as well when there is work to be done, as when there is not . . . ." 1 Blackstone, Commentaries 335 (1832).

The transformation of this status based relationship to a contractually based relationship is discussed in Selznick, Law, Society and Industrial Justice, 123 (1969); see note, "Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith," 93 Harv. L. Rev. 1816, 1824–25 (1980); *Pugh* v. *See's Candies, Inc.,* 116 Cal. App. 3d 311, 171 Cal. Rptr. 917 (1981).

[7] Without citation of supporting authority, Tapping Reeve boldly claimed that Connecticut had no such practice as adopted in England. See Reeve, The Law of Baron and Femme, of Parent and Child, Guardian and Ward, Master and Servant, and of the Powers of the Court of Chancery, 347 (1846). New York, however, adhered to the English rule as late as 1891. See *Adams* v. *Fitzpatrick,* 125 N.Y. 124, 26 N.E. 143 (1891); see generally Feinman, "The Development of the Employment at Will Rule," 20 Amer. J. Leg. Hist. 118 (1976). The employment at will rule was first expressly adopted by this court in *Boucher* v. *Godfrey,* 119 Conn. 622, 627, 178 A. 655 (1935).

[8] St. Antoine, "You're Fired!," 10 Human Rights 32, 33 (1982) (referring to H. G. Wood). Scholars and jurists unanimously agree that Wood's pronouncement in his treatise, Master and Servant § 134 (1877), was responsible for nationwide acceptance of the rule. They also agree that his statement of the rule was not supported by the authority upon which he relied, and that he did not accurately depict the law as it then existed. See Feinman, "The Development of the Employment at Will Rule," 20 Amer. J. Leg. Hist. 118, 126–27 (1976); Summers, "Individual Protection Against Unjust Dismissal: Time for a Statute," 62 Va. L. Rev. 481 (1976); note "Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith," 93 Harv. L. Rev. 1816, 1825 n.51 (1980); note, "Implied Contract Rights to Job Security," 26 Stan. L. Rev. 335 (1974); see also *Pugh* v. *See's Candies, Inc.,* 116 Cal. App. 3d 311, 320 n.3, 171 Cal. Rptr. 917 (1981).

party "for good cause, for no cause or even for cause morally wrong . . . ." *Payne* v. *Western & Atlantic R. Co.,* 81 Tenn. 507, 519–20 (1884), overruled on other grounds, *Hutton* v. *Watters,* 132 Tenn. 527, 179 S.W. 134 (1915). The rule, fostered in part by the predominant laissez-faire philosophy of the period, reserved to the employer absolute power to dismiss the employee, and was considered necessary to preserve the autonomy of managerial discretion in the work place and the freedom of the parties to make their own contract. See *Coppage* v. *Kansas,* 236 U.S. 1, 10, 35 S. Ct. 240, 59 L. Ed. 441 (1915); *Adair* v. *United States,* 208 U.S. 161, 28 S. Ct. 277, 52 L. Ed. 436 (1908); *Somers* v. *Cooley Chevrolet Co.,* 146 Conn. 627, 629, 153 A.2d 426 (1959); *Fisher* v. *Jackson,* 142 Conn. 734, 736, 118 A.2d 316 (1955); *Boucher* v. *Godfrey,* 119 Conn. 622, 627, 178 A. 655 (1935); see generally Feinman, "The Development of the Employment at Will Rule," 20 Amer. J. Leg. Hist. 118 (1976); Blades, "Employment at Will vs. Individual Freedom: On limiting the Abusive Exercise of Employer Power," 67 Colum. L. Rev. 1404 (1967); note, "Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith," 93 Harv. L. Rev. 1816 (1980).

In more recent years we have witnessed substantial erosion of the employment at will rule. Congress, recognizing that most individual employees are powerless to demand a term contract,[9] has protected the right of employees "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. Collective bargaining agreements ordinarily contain provisions

---

[9] In its statement of findings and policies concerning the National Labor Relations Act, Congress declared that, because of the inequality of bargaining power, freedom of contract was an illusory right, nonexistent in the employer-employee relationship. See 29 U.S.C. § 151; see also *NLRB* v. *Jones & Laughlin Steel Corporation,* 301 U.S. 1, 35, 57 S. Ct. 615, 81 L. Ed. 893 (1937).

prohibiting dismissal without "cause" or "just cause" which now serve to protect a significant portion of the work force from groundless dismissal.[10] Government employees similarly enjoy protection from arbitrary discharge.[11] Congress has also enacted statutes prohibiting employers from dismissing employees in retaliation for reporting employer activity in contravention of specific statutes.[12] Many state statutes also restrict the employer's right to exercise a contractual power to dismiss an employee.[13]

For those employees not protected by collective bargaining agreements, civil service statutes or other laws, the courts have occasionally found an implied promise to discharge only for cause in the circumstances of particular employment relationships. Sometimes the promise has been found in the representations contained in an employee relations manual or handbook.[14] In appropriate circumstances, such an agreement may arise

[10] Eighty percent of all nonagricultural collective bargaining agreements contain a requirement that dismissal be for cause or just cause. See Peck, "Unjust Discharges From Employment: A Necessary Change in the Law," 40 Ohio St. L.J. 1, 8 (1979). In 1981, however, only 25 percent of the nonagricultural work force was covered by a collective bargaining agreement. See note, "Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception," 96 Harv. L. Rev. 1931, 1934 (1983).

[11] See, e.g., 5 U.S.C. § 7513 (restricting the right to dismiss a civil servant only "for such cause as will promote the efficiency of the service").

[12] See, e.g., Fair Labor Standards Act, 29 U.S.C. § 215; Occupational Safety and Health Act, 29 U.S.C. § 660 (c); Railroad Safety Act, 45 U.S.C. § 441 (a) (1).

[13] For examples of state statutes restricting the employer's right to dismiss an employee, see Public Acts 1983, No. 83-578 (prohibiting dismissal in retaliation for exercising free speech rights); General Statutes § 46a-60 (prohibiting dismissal for reasons of race, sex, religion, physical or mental disability); General Statutes § 51-247a (prohibiting dismissal for serving jury duty).

[14] See *Greene* v. *Howard University,* 412 F.2d 1128 (D.C. Cir. 1969); *Leikvold* v. *Valley View Hospital,* 116 L.R.R.M. 2193 (Ariz. 1984); *Toussaint* v. *Blue Cross,* 408 Mich. 579, 292 N.W.2d 880 (1980); *Weiner* v. *McGraw-Hill, Inc.,* 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982); see generally Schreiber, "Wrongful Termination of at Will Employees,"

when an employee, in reliance on an implied representation that the position will not arbitrarily be terminated, leaves his current employment, or otherwise acts in reasonable and significant reliance on the representation. These illustrations are not intended to encompass all of the situations in which an employment contract may be found not to be terminable at will. A majority of courts—including this one—have also approved a common law cause of action in tort for discharges "where the discharge contravenes a clear mandate of public policy." *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 474, 427 A.2d 385 (1980).[15] See *Tameny* v. *Atlantic Richfield Co.,* 27 Cal. 3d 167, 164 Cal. Rptr. 839, 610 P.2d 1330 (1980); *Geary* v. *United States Steel Corporation,* 456 Pa. 171, 319 A.2d 174 (1974); *Ward* v. *Frito-Lay, Inc.,* 95 Wis. 2d 372, 290 N.W.2d 536 (1980); see generally note, "Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception," 96 Harv. L. Rev. 1931 (1983); Weiss, "State by State: Chipping Away at Employment at Will," National L.J., Jan. 18, 1982, p. 26. (Twenty-two of the thirty states surveyed approve of the wrongful discharge tort). In the present case we are asked to adopt another emerging theory that limits the employer's right to discharge an at-will employee: the implied covenant of good faith and fair dealing.[16]

---

68 Mass. L. Rev. 22, 26-27 (1983); note, "Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception," 96 Harv. L. Rev. 1931, 1935 (1983); note, "Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith," 93 Harv. L. Rev. 1816, 1820–21 (1980).

[15] The decision in *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980), has attracted some comment. See Mooney and Pingpank, "Wrongful Discharge a 'New' Cause of Action?," 54 Conn. B. J. 213 (1980); McWeeny, "Out of the Fog: A Different View on Retaliatory Employee Discharge," 54 Conn. B. J. 235 (1980); comment, "Guidelines for a Public Policy Exception to the Employment at Will Rule: The Wrongful Discharge Tort," 13 Conn. L. Rev. 617 (1981).

[16] At present four jurisdictions have expressly adopted a requirement that an employer exercise the power to discharge in good faith. See *Moore* v.

## II

The implied covenant of good faith and fair dealing has been applied by this court in a variety of contractual relationships, including: leases; *Central New Haven Development Corporation* v. *La Crepe, Inc.*, 177 Conn. 212, 413 A.2d 840 (1979); insurance contracts; *Hoyt* v. *Factory Mutual Liberty Ins. Co.*, 120 Conn. 156, 159, 179 A. 842 (1935); *Bartlett* v. *Travelers Ins. Co.*, 117 Conn. 147, 155, 167 A. 180 (1933); cf. *Grand Sheet Metal Products Co.* v. *Protection Mutual Ins. Co.*, 34 Conn. Sup. 46, 375 A.2d 428 (1977) (tortious breach of covenant of good faith); and construction contracts with provisions making payment conditional upon presentation of the architect's or engineer's certificate. See *Grenier* v. *Compratt Construction Co.*, 189 Conn. 144, 148, 454 A.2d 1289 (1983).

The Restatement (Second) of Contracts similarly recognizes an implied covenant of good faith and fair dealing in every contract without limitation. See 2 Restatement (Second), Contracts § 205 (1979); see also General Statutes § 42a-1-203. "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ." 2 Restatement (Second), Contracts § 205, comment a

---

*Home Ins. Co.*, 601 F.2d 1072 (9th Cir. 1979) (applying Arizona law); but see *Daniel* v. *Magma Copper Co.*, 127 Ariz. 320, 620 P.2d 699 (1980); *Mitford* v. *de Lasala*, 666 P.2d 1000 (Alaska 1983); *Gates* v. *Life of Montana Ins. Co.*, 196 Mont. 178, 638 P.2d 1063 (1982); *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977). California has implicitly adopted the rule; see *Pugh* v. *See's Candies, Inc.*, 116 Cal. App. 3d 311, 171 Cal. Rptr. 917 (1981); while New Hampshire, where the rule was first announced, has since retreated and presently requires that the discharge violate public policy. See *Howard* v. *Door Woolen Co.*, 120 N.H. 295, 414 A.2d 1273 (1980). Wisconsin and Hawaii have both expressly refused to follow the rule. See *Parnar* v. *Americana Hotels, Inc.*, 652 P.2d 625 (Hawaii 1982); *Brockmeyer* v. *Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983).

(1979); see also *Clover Mfg. Co.* v. *Austin Co.*, 101 Conn. 208, 214, 125 A. 646 (1924); see generally Holmes, "Is There Life After Gilmore's Death of Contract? — Inductions from A Study of Commercial Good Faith in First-Party Insurance Contracts," 65 Cornell L. Rev. 330 (1980); Burton, "Breach of Contract and the Common Law Duty to Perform in Good Faith," 94 Harv. L. Rev. 369 (1980). Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy. See *VTR, Inc.* v. *Goodyear Tire & Rubber Co.*, 303 F. Sup. 773 (S.D.N.Y. 1969); 3 Corbin, Contracts § 564, (1960); 11 Williston, Contracts (3d Ed. Jaeger) § 1295.

The plaintiff contends that the good faith principle is applicable to the termination of an employment contract as well as to its performance and subjects the employer to liability whenever an employee is discharged without just cause.[17] This position, of course, would write into every hiring of indefinite duration a provision requiring good cause for termination.

The defendant maintains that the concept of good faith is too amorphous, permitting juries to police managerial decisions concerning control over the workforce guided by vague concepts of public morality

---

[17] A portion of the trial court's charge upon the first count may be construed to adopt this view: "When one who has been employed for such time as his services are satisfactory is discharged the employer must act in good faith. Where there is evidence tending to show that the discharge was due to some impermissible reason, other than dissatisfaction with the services, the question is one for the jury to decide."

rather than principles of law.[18] This would result, it is claimed, in numerous lawsuits and would impair the exercise of managerial discretion. At least two states have declared that "[i]mposing a good faith duty to terminate would unduly restrict an employer's discretion in managing the work force." *Brockmeyer* v. *Dun & Bradstreet,* 113 Wis. 2d 561, 569, 335 N.W.2d 834 (1983); see *Parnar* v. *Americana Hotels, Inc.,* 652 P.2d 625 (Hawaii 1982).

The position we adopt lies somewhere between those of the parties.[19] While we see no reason to exempt

---

[18] Professor Robert S. Summers has suggested that the good faith requirement acts as an "excluder," determining what type of activity society will not tolerate: "In contract law, taken as a whole, good faith is an 'excluder.' It is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out." Summers, " 'Good Faith' in General Contract Law and the Sales Provision of the Uniform Commercial Code," 54 Va. L. Rev. 195, 201 (1968).

[19] The minority opinion also appears to reject the claim of the plaintiff that the implied covenant of good faith and fair dealing in an employment contract requires the employer to show good cause for discharging the employee. It takes the view that this covenant implies "that the termination will not be brought about as a result of the employer's bad faith." Where the reason for discharge does not involve "impropriety . . . derived from some important violation of public policy," as in *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 475, 427 A.2d 385 (1980), but falls short of qualifying as good cause, from the broad spectrum of discharges falling between these extremes the minority opinion attempts to delineate a "bad faith" category for which liability would be imposed. No explanation is given, however, of what criteria are to be used in allowing a recovery when the reason for discharge violates no public policy but does not amount to good cause. It would appear that the rubric "bad faith" would be applied to any discharge which is merely arbitrary, i.e., without a valid reason, if the circumstances of the employee generate sufficient empathy.

The case of *Pugh* v. *See's Candies, Inc.,* 116 Cal. App. 3d 311, 171 Cal. Rptr. 917 (1981), relied upon by the minority discusses with evident approval a broader position than that of the minority, that every arbitrary discharge is actionable. Ultimately, however, it is found from the circumstances of the particular employment relationship that "the employer's conduct gave rise to an implied promise that it would not act arbitrarily in dealing with its employees."

employment contracts from the implication of a covenant of good faith and fair dealing in the contractual relationship, we do not believe that this principle should be applied to transform a contract of employment terminable at the will of either party into one terminable only at the will of the employee or for just cause. We have previously acknowledged "that courts should not lightly intervene to impair the exercise of management discretion or to foment unwarranted litigation." *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 477, 427 A.2d 385 (1980). At the same time we have declared that the many employees without bargaining power to obtain employment for a definite term are entitled to judicial protection when the cause for dismissal is derived from some important violation of public policy. Id., 480. In *Sheets* our discussion was limited to the tort claim of wrongful discharge of an employee in retaliation for his reporting to his employer deviations from food quality standards which rendered the labels placed upon his employer's products false or misleading in violation of the Connecticut Uniform Food, Drug and Cosmetic Act, General Statutes § 19-222. Id., 473. It was, therefore, unnecessary to consider the alternative contractual claim based upon breach of an implied condition of the employment agreement. Id., 474.

The Massachusetts courts have applied the good faith and fair dealing doctrine to find a breach of contract where the discharge was for a reason contrary to public policy, as in *Sheets,* and also, despite the absence of any such improper motivation, where the termination has deprived the employee of benefits attributable to past services. *Cort* v. *Bristol-Myers Co.,* 385 Mass. 300, 431 N.E.2d 908 (1982); *Gram* v. *Liberty Mutual Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21 (1981); *Siles* v. *Travenol Laboratories, Inc.,* 13 Mass. App. 354, 433 N.E.2d 103, further appellate review denied, 386 Mass. 1103, 440 N.E.2d 1176 (1982). Acceptance of the good

faith principle in the context of employment, however, has not meant that only discharges for good cause are justifiable. "[T]he absence of good cause to discharge an employee does not alone give rise to an enforceable claim for breach of a condition of good faith and fair dealing." *Cort* v. *Bristol-Myers Co.*, supra, 303.[20] As currently applied to employment contracts in Massachusetts, a breach of good faith implies an overreach-

[20] In *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 431 N.E.2d 908 (1982), the Massachusetts Supreme Judicial Court elaborated upon *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), and *Gram* v. *Liberty Mutual Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21 (1981), both cases involving claims of a breach of the duty of good faith: "In the *Fortune* case, we recognized that an employer may not in every instance terminate without liability an employment contract terminable at will. There, we upheld the plaintiff's claim for future commissions based on past service when the employer terminated the plaintiff's employment without good cause and for the purpose of retaining the sales commissions for itself. In an opinion that was released after this case was argued, we considered further the question of the rights of an employee at will who was discharged without good cause. *Gram* v. *Liberty Mutual Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21 (1981). We noted that the absence of good cause to discharge an employee does not alone give rise to an enforceable claim for breach of a condition of good faith and fair dealing. Id. We recognized that termination of at-will employment could give rise to a claim where the reason for the discharge was contrary to public policy. Id. The employer's predatory motivation in the *Fortune* case can be classified as a reason contrary to public policy. In the *Gram* case, which did not involve an improper motive for the discharge, we went beyond those cases that had allowed recovery for the discharge of an at-will employee because of a motivation which was contrary to public policy. We allowed the plaintiff, an insurance salesman, who, if not discharged, would have been entitled to renewal commissions, to recover for 'reasonably ascertainable future compensation based on his past services.' Id." *Cort* v. *Bristol-Myers Co.*, supra, 303–304. The above-quoted paragraphs make clear that an employee has two different possible causes of action for wrongful discharge in Massachusetts: (1) where the discharge was motivated by a desire to retain financial benefits owed the employee (a public policy violation); *Fortune* v. *National Cash Register Co.*, supra; or (2) where the employee is discharged without good cause and without an improper motive, yet is nonetheless deprived of ascertainable future financial benefits related to past services. *Gram* v. *Liberty Mutual Ins. Co.*, supra. See also *Siles* v. *Travenol Laboratories, Inc.*, 13 Mass. App. 354, 433 N.E.2d 103, further appellate review denied, 386 Mass. 1103, 440 N.E.2d 1176 (1982).

ing upon the part of the employer by taking advantage of its superior bargaining power and depriving the employee of "compensation that is clearly identifiable and is related to the employee's past service." *Cort* v. *Bristol-Myers Co.*, supra, 304; *Phillips* v. *Youth Development Program, Inc.*, 390 Mass. 652, 459 N.E.2d 453 (1983); *Maddaloni* v. *Western Massachusetts Bus Lines, Inc.*, 386 Mass. 877, 438 N.E.2d 351 (1982); *Gram* v. *Liberty Mutual Ins. Co.*, supra, 29; *Siles* v. *Travenol Laboratories, Inc.*, supra.[21]

Although we do not disapprove of the application of the good faith principle to contracts of employment in the restricted manner illustrated by the Massachusetts cases, an issue not presently before us, we limit ourselves to the conclusion that a breach of such an implied covenant cannot be predicated simply upon the absence of good cause for a discharge. We decline the invitation of the plaintiff to transform the requirement of good faith into an implied condition that an employee may be dismissed only for good cause. To hold otherwise would render the court a bargaining agent for every employee not protected by statute or collective bargaining agreement, including employees whom congress has specifically excluded from the protection of the National Labor Relations Act, such as those in management positions. See *NLRB* v. *Yeshiva University*, 444 U.S. 672, 100 S. Ct. 856, 63 L. Ed. 2d 115 (1980). The complexity of the multifarious employment relationships militates against the establishment of the good cause standard for discharge to govern all at will employment relationships. See St. Antoine, "You're Fired!," 10 Human Rights 32, 36-53 (1982); Summers, "Individual Protection Against Unjust Dismissal: Time for a Statute," 62 Va. L. Rev. 481 (1976).

---

[21] A similar view has been adopted in Alaska. *Mitford* v. *de Lasala*, 666 P.2d 1000 (Alaska 1983) (employee discharged, depriving him of 10 percent profit sharing arrangement).

Whether we should return to the earlier common law conception of employment as a status not dissoluble at will is an issue which has received legislative attention. See H.B. No. 5179, 1974 Sess.; see generally Creo, "Arbitration of Nonunion Employees' Discharge Cases," Barrister 35, 37 (Winter 1984) (setting forth proposed state legislation). What categories of employment should be given such protection and what criteria should determine whether there exists good cause for a discharge are questions which the General Assembly may deal with more comprehensively than the courts.[22]

Although we endorse the applicability of the good faith and fair dealing principle to employment contracts, its essence is the fulfillment of the reasonable expectations of the parties. Where employment is clearly terminable at will, a party cannot ordinarily be deemed to lack good faith in exercising this contractual right. Like other contract provisions, which are unenforceable when violative of public policy, the right to discharge at will is subject to the same restriction. We see no reason presently, therefore, to enlarge the circumstances under which an at-will employee may successfully challenge his dismissal beyond the situation where the reason for his discharge involves "impropriety . . . derived from some important violation of public policy." *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 475. Whether a claim resulting from such a discharge is framed in tort or in contract should make no difference with respect to the issue of liability.

[22] We note that the enactment of General Statutes § 31-51m in 1982, our "whistle blowing statute," modifies to some extent the relief available and the procedure to be followed prior to the statute by an employee discharged for reporting violations of laws or regulations to a governmental agency. Our holding in *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980), which was applicable to the "whistle blowing" situation, as well as others, provided simply the standard common law remedy of an action in tort for damages.

## III

The first count of the complaint alleges that the plaintiff has been employed by the defendant under an oral contract at an annual salary since March 1, 1967, that he was discharged on August 16, 1979, for "alleged dereliction in the performance of his duties," and that his dismissal constituted a breach of the oral contract of employment and of its implied covenant of good faith and fair dealing. The claim that Magnan was fired because he refused to sign a false statement as requested by the defendant is contained in the second count, which the jury resolved against him. On appeal the plaintiff has sought to justify the verdict in his favor on the first count wholly upon the ground that an employment contract of indefinite duration can be terminated by the employer only for good cause. We have rejected that basis for upholding the verdict and we agree with the defendant that the first count should never have been submitted to the jury. There was no evidence which would make it necessary to consider a more limited application of the good faith termination rule such as that followed in Massachusetts where the discharge has deprived an employee of clearly identifiable compensation relating to past services. All compensation earned by Magnan prior to his discharge has been paid and he has not been deprived of his vested pension benefits.[23]

The trial court did not, however, wholly confine the first count to the claim that the plaintiff had been discharged without a justifiable reason. A general instruction on the significance of the pleadings was given

---

[23] In his complaint the plaintiff alleged that at the time of his dismissal he had vested pension rights. Counsel for the defendant apparently conceded at trial that the plaintiff's pension rights remained unaffected by his discharge. In response to a question from the court concerning that issue, the defendant's counsel replied: "[h]e's got his vested pension rights."

informing the jury that "[t]he rights of the parties are to be determined upon the basis of those allegations made in the pleadings," and that evidence "with respect to facts outside the allegations or the pleadings, must be disregarded in your deliberations." The court stated the issue to be whether "Anaconda act[ed] in good faith in discharging Mr. Magnan," declaring that "[w]hen one who has been employed for such time as his services are satisfactory is discharged the employer must act in good faith." The charge continued: "Where there is evidence tending to show that the discharge was due to some impermissible reason, other than dissatisfaction with the services, the question is one for the jury to decide. . . . It is a question of fact for you to determine whether or not the requirement that Anaconda exercised good faith in its conduct of the employment contract with Mr. Magnan was breached by them."

Referring specifically to the first count as setting forth a claim for breach of an implied covenant of the employment contract as "one of the exceptions to the general rule that employment is terminable at will," the court instructed the jury that "the plaintiff must do more than establish that there was no just cause for his discharge" and that he must prove that "the defendant was motivated by bad faith or malice or based on retaliation and that it constitutes an aspect of fraud, deceit or misrepresentation." In discussing the evidence related to the first count, the court pointed out that the defendant employer was entitled to receive Magnan's cooperation in the investigation being conducted, including his execution of the written statement which had been prepared, unless it was false. Even if the statement were false, the jury was advised, the defendant would have acted in good faith if its investigators "honestly believed the statement was true in its essentials and were trying to protect the legitimate interests of their employer . . . ." The charge on the

first count concluded as follows: "So if you find that the plaintiff has proven by a preponderance of the evidence that in terminating his employment the defendant acted dishonestly or fraudulently or deceitfully, you should find the liability issue for the plaintiff. But if you find the defendant terminated Mr. Magnan because its responsible employees honestly believed that he had been involved in thefts of company property or had knowledge of such thefts or that he had been untruthful about his involvement or knowledge, then you should find for the defendant on liability."

In charging on the second count of the complaint the court instructed: "[T]he plaintiff must prove a demonstrably improper reason for his dismissal, a reason whose impropriety derives from some important violation of public policy. . . . If you find that the defendant's motive in terminating Mr. Magnan was to punish him for refusing to sign a statement which the defendant's responsible employees know to be false, then you would be justified in finding his discharge violated public policy. On the other hand if you find that the defendant discharged the plaintiff because it believed the plaintiff had been involved in thefts of company property or had knowledge about them or took part in a cover-up and refused to cooperate in a theft investigation, then you could not properly find that the plaintiff's discharge violated public policy and you would be required to return a verdict for the defendant."[24]

---

[24] The entire charge on the second count was as follows:

"In the second count of the complaint, the plaintiff claims the benefit of a second exception to the general rule that contracts of employment for an indefinite time are terminable at will. This exception is in some ways quite similar to that which I have just discussed with you. To recover under the second count the plaintiff must prove a demonstrably improper reason for his dismissal. A reason whose impropriety is derived from some important violation of public policy. This exception forbids the discharge of an employee for exercising a right conferred upon him by law or for complying with some legal requirement or for a reason which would be injurious to the public or against the public good. That is the plaintiff would be entitled to a recovery if he can establish that he was discharged from his employ-

Despite the broader allegations of the first count and the less precise language of the portion of the charge thereon regarding the duty of an employer to act in good faith when discharging an employee, the verdict for the plaintiff on that count could not have rested wholly upon the absence of good cause to terminate the employment contract unless the jury utterly disregarded the court's specific instruction to the contrary. It appears that the charge on both counts formulated the critical factual issue in essentially the same terms: whether the defendant's investigators had obtained Magnan's discharge for his refusal to sign a false state-

ment because the defendant intended to punish his conduct as a good citizen.

"If you find that the defendant's motive in terminating Mr. Magnan was to punish him for refusing to sign a statement which the defendant's responsible employees know to be false, then you would be justified in finding his discharge violated public policy. On the other hand if you find that the defendant discharged the plaintiff because it believed the plaintiff had been involved in thefts of company property or had knowledge about them or took part in a cover-up and refused to cooperate in a theft investigation, then you could not properly find that the plaintiff's discharge violated public policy and you would be required to return a verdict for the defendant.

"In making your determination of the liability issue I have explained to you, your decision will not depend on whether or not you are convinced that Mr. Magnan was, in fact, involved in stealing a refrigerator or flashlights or anything else. Whether or not the plaintiff believed the statement he was asked to sign to be false, or whether or not if you had employed the plaintiff you would have discharged him. Rather it will depend on whether you find that the defendant's responsible employees discharged the plaintiff because they believed that the plaintiff had been involved in some thefts of company property or that he was untruthful about his involvement and uncooperative in the investigation of the general theft problem.

"If the defendant acted on such a belief, when it terminated the plaintiff, it is entitled to a verdict in its favor. On the other hand if the plaintiff has proven to you that he was fired because he refused to sign a statement which the defendant made up and that the defendant knew the statement was false or did not care whether it was true or false, then the plaintiff would be entitled to a verdict in his favor.

"The state has abiding interest in seeing to it that men are truthful in their affairs. If you find that Anaconda sought to have Mr. Magnan sign a statement which they knew was false, and that they did know was false or that they did not care whether it was true or false, such efforts are contrary to public policy."

ment when they knew of its untruthfulness or were unconcerned with its truth or falsity. The response of the jury to that question on the first count cannot be reconciled with its response on the second count. Although consistency of verdicts in criminal cases is not required; *Harris* v. *Rivera,* 454 U.S. 339, 102 S. Ct. 460, 70 L. Ed. 2d 530 (1981); *Hamling* v. *United States,* 418 U.S. 87, 101, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974); *Dunn* v. *United States,* 284 U.S. 390, 393, 52 S. Ct. 189, 76 L. Ed. 356 (1932); *State* v. *Rosado,* 178 Conn. 704, 709, 425 A.2d 108 (1979); in civil cases when a verdict rests upon a factual finding contradictory to another finding of the same issue by the trier the judgment cannot stand. *Marko* v. *Stop & Shop, Inc.,* 169 Conn. 550, 556, 364 A.2d 217 (1975); *Fabrizi* v. *Golub,* 134 Conn. 89, 94, 55 A.2d 625 (1947); *O'Brien* v. *Connecticut Co.,* 97 Conn. 419, 422, 117 A. 498 (1922); 76 Am. Jur. 2d, Trial § 1154.

Although we have concluded that the first count should not have been submitted to the jury because the only evidence supporting it was the retaliatory discharge alleged in the second count of the complaint,[25] the fact that its submission resulted in a verdict wholly inconsistent with the verdict on the second count cannot be overlooked. The defendant is entitled to have the verdict on the first count set aside and judgment not obstante verdicto rendered on that count in accordance with its motions, which the trial court has denied. Although the plaintiff has not appealed, the interests of justice require that the verdict on the second count

[25] We see no good reason for submitting both counts to the jury, as the minority opinion would prefer, since the factual issues to be determined by the jury for each count are identical. Since the plaintiff in this case can prevail only in the event that his discharge involved a violation of public policy and since that claim is expressly set forth in the second count, the submission of the first count, which contains no specific reference to such a claim, would be superfluous and would tend to confuse the jury, as demonstrated by the inconsistent verdicts at the first trial.

also be set aside for inconsistency and that the case be remanded to the trial court for a new trial on that count. Practice Book § 3063; see *Batick* v. *Seymour,* 186 Conn. 632, 641, 443 A.2d 471 (1982).

There is error, and the case is remanded for further proceedings in accordance with this opinion.

In this opinion PETERS, HEALEY and GRILLO, Js., concurred.

PARSKEY, J., concurring in part and dissenting in part. In *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980), we held that an employee at will may not be discharged for a reason whose impropriety is derived from some important violation of public policy. *Sheets* involved a new application of an old common law principle, namely, that contractual provisions which offend public policy will not be enforced. *Hanford* v. *Connecticut Fair Assn.,* 92 Conn. 621, 623, 103 A. 838 (1918); *Smith* v. *Crockett Co.,* 85 Conn. 282, 287, 82 A. 569 (1912). The second count of the complaint in this case is based on the principle of law decided in *Sheets.*

Respecting the first count of the complaint, the majority opinion has miscast the principal issue. This count is based on a breach of an implied covenant of good faith and fair dealing. The plaintiff neither claimed nor did the court charge that a recovery under this count could be based on a showing by the plaintiff that his employment was terminated without just cause. To the contrary, the court charged the jury that though it could consider the absence of just cause as a factor in arriving at the ultimate conclusion that the defendant had acted in bad faith, even if it so found, that in itself would not afford a basis for recovery under this count, that in addition the plaintiff must show that the defendant acted in bad faith, that is, dishonestly,

fraudulently or deceitfully. When the first count is cast in a proper light it presents an entirely different picture than the caricature portrayed by the majority.

The first count is premised on the proposition that in every contract there is an implied covenant of good faith and fair dealing. Such covenant is also not a new concept. As the majority opinion points out it is well recognized not only as part of the common law in general; 2 Restatement (Second), Contracts § 205; but also in related areas such as the Uniform Commercial Code. General Statutes § 42a-1-203. The majority also sees no reason to exempt employment contracts from the implication of a covenant of good faith and fair dealing. But having said that it goes on to say that a breach of such covenant will be enforced in the employment at will situation only if the basis for the termination of the employment violates public policy. If the termination violates public policy, then under *Sheets* it is wrongful and actionable and one is not required to rely on an implied covenant of good faith. When it is needed, in cases of bad faith discharges which do not violate public policy, the majority gives the employee a covenant that is nothing more than an empty vessel.

The majority rationalizes its position by stating that all it is doing is fulfilling the reasonable expectation of the parties. Such reasoning begs the question. In an employment at will situation the parties may reasonably expect that the employer does not have to show good cause for terminating the relationship. They also have a right to expect, in view of the implied covenant of good faith and fair dealing, that the termination will not be brought about as a result of the employer's bad faith.[1] Although in a number of situations, the factual

---

[1] This case focuses on the good faith aspect of the implied covenant. What is not before us and therefore what we need not decide is the fair dealing factor and its application to the reasonable expectation of job security based

foundation for both causes of action may overlap, this is not necessarily the case and when they do not there is no sound reason in my opinion why the injured party should be restricted to a single legal basis for recovery.

A simple illustration will demonstrate the reason for giving remedial substance to a breach of the implied covenant of good faith. Assume that an employer falsely accuses an employee of theft of the employer's property. Assume further that the employer insists on the employee signing a statement admitting to the theft and upon the employee's refusal terminates the employment. Under these facts the employee should be able to bring an action for wrongful discharge in two counts, one based on a bad faith breach of the implied covenant, the other on a retaliatory discharge in violation of public policy. If, in such case, the plaintiff can prove that he was discharged on the basis of a false accusation of theft but could not prove that the employer demanded that he sign a false statement then his failure to recover on the second count should not preclude recovery on the first count.

The case of *Pugh* v. *See's Candies, Inc.,* 116 Cal. App. 3d 311, 171 Cal. Rptr. 917 (1981), exemplifies the importance of breach of an implied covenant of good faith and fair dealing as an independent ground of recovery. In that case, the plaintiff was fired after thirty-two years of employment with the defendant. He began his employment washing pots and pans and at the time of his dismissal he was vice president in charge of production and a member of the board of directors. He had never received any complaints or criticism about his job performance. He was given no explanation for his abrupt and unexpected termination.

on satisfactory long term service. See Note, "Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith," 93 Harv. L. Rev. 1816, 1840 (1980).

It was the plaintiff's theory that he was fired because he had objected to a provision in a proposed collective bargaining agreement that would have permitted the defendant to pay its seasonal employees at a lower rate and because he refused to be part of a team that negotiated an allegedly sweetheart contract with the union. He brought suit against the company (and the union) in two counts, claiming that his firing was in retaliation for those stands and therefore offended public policy and that it also violated the implied promise that he would be terminated only for good cause. The case went to trial before a jury and after the plaintiff concluded his case-in-chief, the trial court granted the defendants' motions for nonsuit.

The Court of Appeals agreed that the plaintiff had failed to establish a violation of public policy and upheld the nonsuit on that count. It did not agree, however, that the plaintiff had failed to establish an implied promise by the employer to refrain from acting arbitrarily, and it reversed the nonsuit on that count. Thus, while unable to establish a violation of public policy the plaintiff was permitted to proceed on breach of contract grounds. Under the majority's view, the defendant employer's egregious conduct would have been rewarded. To turn around an old legal aphorism it is apparent that hard law makes bad cases.

In this case I agree that the verdicts are inconsistent because both counts rely on the same factual foundation. If the jury found for the plaintiff on the first count they should have arrived at the same result on the second. Nevertheless, the plaintiff should not be deprived of the opportunity to present both legal theories arising out of the same transaction, one based on contract, the other on tort.