**John F. RUFFALO, Plaintiff,**

v.

**CUC INTERNATIONAL, INC., et al., Defendants.**

**No. 3:96CV36(JBA).**

United States District Court, D. Connecticut.

Sept. 29, 1997.

---

Robert L. Keepnews, Pepe & Hazard, Southport, CT, Vicki A. Hagel, Charles E. Butler, Smith, Katzenstein & Furlow, Wilmington, DE, for Plaintiff.

David S. Poppick, Matthew Robert Asman, Epstein, Becker & Green, P.C., Stamford, CT, Sheldon N. Sandler, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for Defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### [DOC. 23]

ARTERTON, District Judge.

This is a case alleging age discrimination, in violation of 29 U.S. § 621 et seq., and breach of contract, promissory estoppel, quantum meruit, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing in violation of Connecticut common law. This matter is before the court on defendant's motion for summary judgment.

### Legal Standard

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute, and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has met its burden, "the non-moving party,

in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995); *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper. *Finley v. Giacobbe*, 79 F.3d 1285, 1291 (2d Cir. 1996). However, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). In deciding a motion for summary judgment, all reasonable inferences and any ambiguities must be drawn in favor of the non-moving party. *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990).

### Discussion

#### 1. Age Discrimination Claim

In the absence of direct proof of age discrimination, actions brought under the Age Discrimination in Employment Act must be analyzed under the shifting burden requirements of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Maresco v. Evans Chemetics*, 964 F.2d 106, 110 (2d Cir.1992) (*McDonnell Douglas* test applies to ADEA cases). The plaintiff must first establish a prima facie case by showing that 1) the plaintiff was a member of a protected age group, 2) he was qualified for the position in question, 3) he was not given the position, and 4) the circumstances under which he was denied the position give rise to an inference of discrimination. Second, if the plaintiff establishes the prima facie case, the burden then shifts to the defendant to articulate a non-discriminatory, legitimate [1] business reason for the alleged discriminatory action. If the defendant can proffer such a reason, the plaintiff then must carry the ultimate burden of proving that the defendant's proffered reason was pretextual, and the real reason was discrimination.

■ Generally in ADEA actions, the burden of proof of the prima facie elements is de minimis. Nonetheless, defendants contend that plaintiff has failed to show that he was qualified for the position in question.

■ The position in question was that of the sales manager of AutoVantage, a position formerly held by Andrew Kates. At the time that Mr. Kates' job became available, Mr. Ruffalo, a fifty-six-year old man, was working as a sales representative for AutoVantage. According to Mr. Ruffalo's affidavit, he was only persuaded to take the sales job with AutoVantage in the first place when John Fullmer, CUC's Chief Marketing Officer, promised him that if and when the sales manager's job became available, "the sales representative 'with the best numbers'" would replace Kates. Ruffalo Aff., ¶ 9. In other words, the sales representative who had made the most sales at the time that the sales manager's job became available would supposedly replace Kates. It is not disputed that Ruffalo was the sales representative with the most sales. Fullmer disputes this contention, and claims that he told Mr. Ruffalo, that

> there were many factors that were considered, and it would be an overall evaluation of the person, high sales numbers, ability to manage a sales force, attention to back-end details, writing ability, motivation and getting along with people, among other things. I never told Ruffalo that the next AutoVantage Sales Manager after Kates

1. The Second Circuit's opinion in *Fisher v. Vassar*, 114 F.3d 1332 (2d Cir.1997) (in banc), casts serious question on the limits of what is considered a "legitimate" business reason. "Individual decision-makers may intentionally dissemble in order to hide a reason that is non-discriminatory but unbecoming or small-minded, such as backscratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." *Id.* at 1337.

would be the person with the best sales numbers.

Fullmer Aff., ¶ 4: When Kates' job did become available after Fullmer became dissatisfied with Kates, Sandi Finn, the Director of AutoVantage Marketing Department was ultimately selected to replace him. Fullmer explains that he chose Finn because he

> decided that AutoVantage credit union marketing and sales needed someone who paid attention to details, who could interact with others and who could effectively communicate and manage. In particular, the position required someone who was detail-oriented in setting up procedures that would make the operations flow properly, and someone who possessed administrative, management and marketing skill necessary to carry out the duties associated with the position. . . .
>
> Ruffalo simply lacked the managerial, administrative and marketing experience I believed was necessary to carry out the duties associated with that position. Ruffalo was not detail oriented, as he even conceded at his deposition. Also, he was sloppy on the back-end.

Fullmer Aff., ¶ 7, 11. Ruffalo disputes Mr Fullmer's proffered explanation for the selection of Finn as the new sales manager. He points out that "Fullmer has said repeatedly during sales meetings, 'numbers mean everything' and Kates had not signed a single credit union. . . . I knew Finn only as a person employed out of the Houston office who experience was in 'back end' work. She had not, to my knowledge, ever supervised a sales force or done sales herself. . . ." Ruffalo Aff., ¶ 22–23. Andrew Kates supports Ruffalo's contention that Fullmer's explanation for hiring Finn does not make sense:

> Fullmer's major criticism to me of my management of the sales force was that I was too wiling to work in the back end and not willing enough to get out front and sell myself. . . . Finn and I had very similar sets of skills. That is one reason why, when Fullmer announced he was letting me go, I was so surprised to learn that Finn was replacing me. I felt that Finn's strengths were my strengths and Finn's weaknesses were my weaknesses, and if

Fullmer really thought he needed a different kind of person in the position he wasn't going to find it in Finn.

Kates Aff., ¶¶ 16–18. Rather, plaintiff argues that Fullmer's proposed qualifications for the sales manager's job, which help explain the hiring of Finn, a 34–year–old woman, were actually post-hoc rationalizations covering up the fact that the true reason for passing-over Mr. Ruffalo was age discrimination.

In a motion for summary judgment, it is inappropriate for the court to render decisions of fact. Rather, the court need only identify the existence of material factual disputes to be decided. Here, defendants contend that plaintiff was not qualified for the job in question, and so does not prove his prima facie case. The record, however, shows that there is a genuine factual dispute on this very point. Whether being a "back-end," detail-oriented person was in fact the essential qualification for the job, or merely a pretext to hire a younger person, appears to be at the heart of this case.

Moreover, this hiring decision was made against the back-drop of several questionable comments that give could rise to an inference of age discrimination. During a Christmas party at Fullmer's home, Fullmer allegedly had other guests feel Ruffalo's arm, commenting that Ruffalo was in good shape for his age. Ruffalo Aff., ¶ 14. At a sales meeting, Mr. Fullmer allegedly announced that he approved of plaintiff's haircut because it made him look young. Ruffalo Aff., ¶ 15. Finally, at another meeting, Fullmer engaged Mr. Ruffalo in a conversation about what type of vitamins one should take to reduce wrinkles. Ruffalo Aff., ¶ 16. Generally, "stray comments" without a demonstrated nexus to the complained of personnel actions will not defeat the employer's motion for summary judgment. *See., e.g., Rush v. McDonald's Corp.,* 966 F.2d 1104, 1106 (7th Cir.1992); *Smith v. Firestone Tire & Rubber Co.,* 875 F.2d 1325, 1329–30 (7th Cir.1989). Here, however, Mr. Fullmer's claim that Mr. Ruffalo did not perform up to expectations puts squarely at issue the nexus of his comments and his promotion of younger Finn as demonstrative of the factual dispute over

pretextual motivation. These arguably inappropriate comments are not only pejorative of age, but they were also made by the maker of the decision in dispute. Based on the foregoing, there must be an assessment of the comments in full context in order to determine what relationship, if any, they have to the disputed hiring decision.

Thus, plaintiff has shown that there are material factual disputes as to his age discrimination claim. Defendants' motion for summary judgment on this count must be denied.

### 2. Breach of Contract and Promissory Estoppel

■ Plaintiff additionally alleges that Fullmer's promise to him in the initial recruitment meeting, that the person with the most sales would take Kates' job, constituted a contract that has been breached. Plaintiff also claims that the promise gives rise to a claim of promissory estoppel. Defendants argue that the promise, if it was even made, was not sufficiently promissory or definitive to give rise to such liability. It is not for the court to decide the nature of the promise made, however. The Connecticut Supreme Court has stated that, "Absent a statutory warranty or definitive contract language, the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact." *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 15, 662 A.2d 89 (1995). "[T]he question of whether statements are promissory should be considered as a question of fact..." *Id.* at 17 n. 6, 662 A.2d 89.

Defendants additionally contend that Ruffalo did not rely on Fullmer's alleged promise because he was merely taking the sales job to "hide out" until he could return to his previous company, Entertainment Publications. Whatever Mr. Ruffalo's ultimate intentions were, he has also alleged that he would not have taken the AutoVantage job but for Mr. Fullmer's promise, and that in reliance on this promise, he moved across country to take the job, and began construction on a new home. Ruffalo Aff., ¶ 9–10. A party need not stake all his future hopes on a

promise to show reliance, merely that he incurred some sort of detriment in belief that the promise was true. Accordingly, defendants' motion for summary judgment is denied as to plaintiff's claims of breach of contract and promissory estoppel.

### 3. Quantum Meruit

■ Ruffalo further alleges that he is entitled to be compensated for the reasonable value of his services under the theory of quantum meruit. Defendants contend that this claims makes no sense as Ruffalo was paid all he was entitled to receive, and there was no implied contract that Ruffalo would be paid any compensation for the manager's job if he were to get it. Plaintiff argues that defendants misunderstand his claim, which is certainly understandable from the paucity of plaintiff's complaint allegations. Ruffalo is not arguing that he is entitled to compensation for the sales manager's job. Rather, that when he was hired, he was promised that he would be paid a salary plus commissions. After he took the job, Kates explained that the salary was not a salary, but a draw against future commissions. Thus, plaintiff argues, he is entitled to those commissions that were deemed to have been given to him in salary. In support of this proposition, Ruffalo offers his own affidavit testimony, as well as that of Mike Winter, another AutoVantage employee. Ruffalo Dep., ¶¶ 37–38; Winter Aff. ¶ 7. The salary arrangements agreed to at the time of Ruffalo's hire are questions of fact that must be determined. Accordingly, this issue is inappropriate for summary judgment.

### 4. Negligent Misrepresentation

■ Even an "innocent misrepresentation of fact 'may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth.'" *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 217, 520 A.2d 217 (1987). "It is sufficient to allege that the representations contained false information." *Id.* at 218, 520 A.2d 217. Fullmer, as the decision maker, presumably had the means of knowing what criteria would be used by him for selecting

the next sales manager. Although it is clear in hindsight that the alleged statement by Fullmer regarding who would be hired as the next sales manager was false, a claim for negligent misrepresentation requires that the information have been false at the time it was given, not simply that the decision maker changed his mind. Defendant claims that plaintiff has not presented any allegation of present intent, other than the ultimate failure to follow-through on the alleged statement.[2] A plaintiff need not allege present intent to deceive, however, merely that the statement was false when made, and the maker had the means to know it was false.

Construing the facts in the light most favorable to the nonmoving party, however, Ruffalo has alleged facts that could imply that the statement was false when given. Ruffalo claims that when he confronted Fullmer about the promise to him, "Fullmer stated that he couldn't afford to lose his best sales person to sales management. While Fullmer agreed that was not fair to me, according to Fullmer 'I had to do something with her,' obviously with reference to Sandi Finn." Ruffalo Aff., ¶ 27. These statements as Ruffalo recounts them, could give rise to the inference that Fullmer's primary concern all along was getting and keeping the best sales person, i.e., the person with the best numbers, in the sales department, and that he never intended to advance the best sales person to management. As Ruffalo laments in hindsight, "CUC had been lying to [him] all along and that the company never intended to honor any of its commitments" to him. Ruffalo Aff., ¶¶ 27–28. Thus, whether or not Fullmer knew at the time that he made the statement to Ruffalo that the statement was false is the subject of a factual dispute.

Negligent misrepresentation additionally requires reliance on the information given. The issue of reliance has been discussed elsewhere in this ruling. Mr. Ruffalo claims he would not have taken the job but for Fullmer's statements as to what the qualifications would be for the sales manager's position. He did take the job, and suffered a detriment as a result.

On this record, it cannot be said that there is no material issue of fact in dispute as to whether Fullmer's statement was false at the time it was made.

### 5. Breach of the Implied Covenant of Good Faith and Fair Dealing

In essence, the principle of the covenant of good faith and fair dealing "is the fulfillment of the reasonable expectations of the parties." *Magnan v. Anaconda Indus.*, 193 Conn. 558, 572, 479 A.2d 781 (1984). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party...." Restatement (Second) of Contracts § 205 (1979) (*quoted in Magnan*, 193 Conn. at 566, 479 A.2d 781). It is a "rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." *Magnan*, 193 Conn. at 567, 479 A.2d 781.

Defendants argue that the covenant is unavailable to plaintiff because plaintiff has other available remedies, and plaintiff does not allege "a demonstrably improper reason ... whose impropriety is derived from some important violation of public policy," as required by *Sheets v. Teddy's Frosted Foods*, 179 Conn. 471, 475, 427 A.2d 385 (1980). The defendants are misguided in their discussion of *Sheets*, which involved the remedies available to a discharged at-will employee, in the absence of a collective bargaining unit or other statutory remedies. In that case, the Connecticut Supreme Court approved a common law cause of action in tort for discharges "where the discharge contravenes a clear mandate of public policy." *Sheets*, 179 Conn. at 474, 427 A.2d 385. In *Magnan v. Anaconda Indus.*, 193 Conn. 558, 479 A.2d 781, the Court also considered the reach of the implied covenant of good faith and fair dealing in the employment context.

---

**2.** Fullmer, for his part, claims that the promise was never made in the first place. Rather, he claims that he told Ruffalo, "there were many factors that were considered, and it would be an overall evaluation of the person." Fullmer Aff., ¶ 4.

This case, however, is not about discharge of at-will employees, or importing the covenant of good faith and fair dealing into the at-will relationship. Rather, plaintiff is alleging that the statement by Fullmer gave rise to a separate contract, which was breached. Therefore, plaintiff need not allege any violation of public policy to prevail on his claim of breach of the covenant of good faith and fair dealing, merely that a contract existed and the expectations of the parties were not fulfilled. As the expectations of the parties and the existence of a contract in this case are the subject of considerable factual dispute, this issue is not ripe for summary judgment.

### 6. Defendant Comp–U–Card Services, Inc.

Based on defendants' representations that Comp–U–Card Services is an entirely separate entity from Comp–U–Card Division of CUC International, and plaintiff's acquiescence in this representation, Comp–U–Card Services is dismissed as a defendant in this action.

### Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment [doc. 23] is hereby DENIED.

IT IS SO ORDERED.