[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this action by plaintiff to foreclose a mortgage, CT Page 3917 the defendant-mortgagor, Virginia I. Burby, interposes the following special defenses: (1) non compos mentis, (2) breach of fiduciary duty, (3) breach of good faith and fair dealing, and (4) fraudulent inducement.[1] Defendant Burby also asserts the following counterclaims: (1) non compos mentis, (2) breach of fiduciary duty, (3) breach of good faith and fair dealing, and (4) violation of Connecticut Uniform Trade Practices Act.
At the trial plaintiff proved the following allegations of its complaint: On April 10, 1990 defendant executed a promissory note for $67,000 in favor of plaintiff and a mortgage deed to secure that note on property known as 432-434 Connecticut Avenue, Newington, Connecticut. Defendant defaulted on her payments on September 1, 1990 and plaintiff has elected to declare the entire balance of the note due and payable. The debt due the plaintiff is $84,034.93 as of February 25, 1992 plus a per diem of $29.77 from that date. The court notes the appraised value of the subject property is $165,000 and that the balance of a first mortgage, prior in right to plaintiff's mortgage, as about $40,000. Accordingly, a foreclosure by sale is appropriate. Before rendering such a judgment, the court must deal with defendant Burby's special defenses and counterclaims.
The facts are as follows: In March 1990 defendant determined she needed an additional mortgage of $5,000 on her house to pay for new decks and to cover outstanding utility bills. Responding to a newspaper advertisement, she called mortgage brokers Equity Lenders and spoke to David Cyr who took her mortgage application over the phone. Defendant said she did free lance typing about 20 hours a week at $10 an hour, was starting a full time job with SNET in two or three weeks at $320 a week and received rent of $800 per month on the other half of her duplex. Cyr inspected defendant's house, found it to be neatly maintained, and to have a value of $275,000. At that time Cyr noticed that defendant was nervous, which he attributed to her desire to get the mortgage quickly in order to hire her relative to build the decks.
Cyr obtained a credit report of defendant; it showed she CT Page 3918 paid her first mortgage regularly but was behind on other bills. A title search of the property revealed a second and third mortgage and other liens. Cyr determined defendant would need $67,000 to pay these mortgages and liens and leave her approximately $5,000 for the decks, to which defendant agreed.
Cyr wanted an interest rate of 16 1/2% but defendant bargained for 16%. Defendant also asked that the first three months' payments on the mortgage be retained in order that she would not be in default at the start of the mortgage. Cyr and defendant agreed to defendant paying ten points as a placement fee.
Cyr communicated the deal he made with defendant to Craig Cooper, executive vice president of plaintiff, a private lender. Cooper also inspected defendant's property. He agreed to give the mortgage to defendant on the terms worked out by Cyr.
Defendant never completed the orientation program for her job with SNET and thus never was hired. She did not tell plaintiff this.
The mortgage closing took place at the law office of Attorney Jeffrey Steinberg on April 10, 1990. Attorney Steinberg explained to defendant that he represented the plaintiff only and he did not represent her; if she wanted her own lawyer, she was entitled to one. Defendant signed a waiver of the right to counsel. During the closing defendant was nervous and did not read the legal papers. Attorney Steinberg carefully explained all of them to her; defendant asked many questions and appeared to Attorney Steinberg to understand the entire transaction.
Defendant never made any payments on the mortgage after the three installments plaintiff withheld at the closing.
This action was started on November 27, 1990. Judgment of foreclosure by sale was entered on July 29, 1991 with a sales date set for November 30, 1991. Defendant Burby moved the judgment be reopened on November 19, 1991, and simultaneously filed an answer containing the special defenses and counterclaims described in the first paragraph of this memorandum. The court granted defendant's motion to reopen on January 21, 1992 and heard this case on its merits.
1. Defendant's Special Defense and Counterclaim of non compos mentis CT Page 3919
Defendant alleges in her first special defense and in the first count of her counterclaim that at the time of the mortgage closing she was suffering from "both anxiety and depression of such a crippling magnitude that her judgment was grossly impaired," rendering "her non compos mentis and incapable of understanding the legal and financial ramifications of her signing said note and mortgage deed." She seeks to have the instrument declared null and void, and asks in her counterclaim for compensatory and punitive damages.
The contracts and conveyances of a person non compos mentis, when not under guardianship, are voidable and not void. Coburn v. Raymond, 76 Conn. 484, 488 (1904). Reynolds v. Devers, 34 Conn. Sup. 107, 112 (1977).
The test of mental capacity to make a contract or deed is whether at the time of execution of the instrument the maker possessed understanding sufficient to comprehend the nature, extent and consequences of the transaction. Nichols v. Nichols, 79 Conn. 644, 657 (1907). Evidence may be considered as to the mind of the alleged incompetent "before, at, and after his contract, in order to ascertain his real condition at the moment of entering into an agreement." Grant v. Thompson,4 Conn. 203, 208 (1822).
Defendant Burby testified that at the closing on April 10, 1990 she was tense and felt under great stress. She did not read the documents and does not recall their being explained to her. Attorney Steinberg testified that she appeared to understand his explanation of every document of the transaction and asked more than the usual number of pertinent questions. On this issue the court believes Attorney Steinberg.
The main conflict in the evidence as to Burby's mental capacities on April 10, 1990 comes from the testimony of the two doctors, one called by the defendant and one by the plaintiff. Neither treated Burby before or at the time of the transaction.
Dr. Paul Piccione, a clinical psychologist with a Ph.D. in psychology, testified for the defendant. He first saw Burby in January 1991, nine months after the closing. He had been called by a social worker in the Newington Department of Social Services because Burby was not caring for herself and needed counseling. Dr. Piccione's preliminary assessment was that Burby was functioning marginally, unable to shop for groceries, maintain her house, concentrate even on TV. He started seeing her two to three times a week. He determined the cause of her psychological problems were (1) genetic, in that her family had CT Page 3920 a strong history of depression; (2) familial, in that she grew up in a chaotic family, and neither parent provided her with early childhood nurturing; and (3) marital, in that she had experienced two disastrous marriages.
Dr. Piccione continued to treat Burby until the time of the trial. He determined she suffered from chronic severe anxiety which affected her decision-making and from a personality disorder, consisting of an avoidant and dependent personality, which made it difficult for her to make decisions. He reported Burby's condition to the Social Security Administration and helped her get a disability award on August 7, 1991, retroactive to August 1988.
His conclusion, based on Burby's history and his treatment of her in 1991 and 1992, was that on April 10, 1990, at the time Burby signed the mortgage documents, her judgment was grossly impaired, she "had great difficulty understanding the process and didn't understand the consequence of signing the mortgage."
Dr. Kenneth M. Selig, a psychiatrist, called by the plaintiff, came to the opposite conclusion. He saw Burby for one and a half hours on January 2, 1992 and for two hours on January 7, 1992. He also reviewed Burby's Social Security Administration records, Dr. Piccione's report to Burby's attorney and his psychological records and notes, records of Burby's internist, and the mortgage documents.
Dr. Selig testified that Burby appeared before him well-groomed and neatly dressed. She was cooperative and articulate, and evinced no anxiety. She performed cognitive portions of the mental status examination well, remembering presidents back to Kennedy, subtracting sevens severally from 100 accurately, interpreting proverbs with insight.
Dr. Selig questioned Burby about the mortgage transaction. Burby said she had sought the loan to pay back utility bills and to replace the rotting decks on her house. She knew when she called a private lender that she could not get a bank loan because she was single, did not have a work history, and good credit. She understood plaintiff's loan would consolidate her debts. She also appreciated the consequences of the loan: she was assuming a $900 a month obligation which she could pay from the rental of the other half of the house and from the $320 weekly salary she contemplated from the SNET job she expected to get. She hoped that once she was established in her job she would be able to obtain a mortgage on more favorable terms and to pay off the plaintiff's loan. Further evidence to Dr. Selig that she CT Page 3921 understood the consequences of the subject transaction was her desire to have withheld the first three monthly mortgage installments so by the end of that period her salary would cover future payments.
Dr. Selig found no indication Burby was psychotic, or her judgment was in any way impaired. He concluded that on April 10, 1990 Burby was competent to execute plaintiff's mortgage, and had more than adequate understanding and appreciation of what she was doing and of its consequences.
This court has considered all of the evidence bearing on defendant's mental condition at the time of the mortgage transaction and reaches the same conclusion as Dr. Selig. Burby comprehended the nature, extent and consequences of that transaction and was competent to enter into it.
2. Breach of Fiduciary Duty
Defendant alleges in her second special defense and in the second count of the counterclaim that plaintiff breached a fiduciary duty owed to Burby. Defendant claims the fiduciary duty arose out of plaintiff's superior knowledge and unequal bargaining power over defendant as to the mortgage transaction and its awareness that defendant trusted plaintiff in the transaction.
Our courts have refused to define a fiduciary relationship in precise detail, "choosing instead to leave `the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.'" Alaimo v. Royer, 188 Conn. 36, 41 (1982), quoting Harper v. Adametz, 142 Conn. 218, 225 (1955). In Alaimo where the plaintiff was in her mid-sixties, lived alone, had physical and mental disabilities, and entrusted her life savings to the defendant to manage and invest, the court let the jury decide whether or not a fiduciary relationship was created.
In Dunham v. Dunham, 204 Conn. 303, 322 (1987) a fiduciary relationship is characterized "by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other." (Underlining added).
There may be unequal situations where a bank as mortgagee lender may be the fiduciary of the mortgagor borrower, such as where the bank becomes a financial adviser of the borrower or where the borrower requests mortgage insurance and the bank is then under a duty to disclose the mechanics of CT Page 3922 procuring such insurance. Stone v. Davis, 419 N.E.2d 1094,1097 (Ohio, 1981). But normally the bank and its customer stand at arm's length. The bank has a right to further its own interest in a mortgage transaction and is under no duty to represent the customer's interest. For the law to impose such a duty would alter the debtor-creditor relationship and preclude the banks from making a profit out of the transaction. "Lending New Meaning to a Banker's Insecurity", 23 New England Law Review, 737, 762, fn. 183. (Winter-Spring, 1988-89).
In this case, plaintiff held itself out as willing to make a loan for the agreed upon amount, at the agreed upon rate and on the agreed upon terms and conditions. It wanted the loan because the interest rate was right and the property securing it was adequate. Plaintiff had had no prior business with Burby to be the basis for a confidential relationship to arise and never assumed the role of Burby's advisor. Simmons v. Jenkins, 750 P.2d 1067, 1071 (Mont. 1988). Burby evinced no emotional disability which alerted plaintiff to an awareness that Burby was placing any special trust in it.
On Burby's part, none of the plaintiff's conduct justified her believing that plaintiff was acting as her protector or trustee. Attorney Steinberg specifically informed her he represented the lender only and not her; he urged her to get her own lawyer and Burby specifically signed a waiver to the right to counsel.
On all the evidence this court concludes that no fiduciary relationship ever arose between plaintiff and defendant.
3. Breach of Covenant of Good Faith and Fair Dealing
Defendant Burby asserts in her third special defense and fourth count of her counterclaim that plaintiff breached an implied covenant of good faith and fair dealing by loaning money to the defendant while it knew she was unemployed, receiving welfare and had no financial resources to pay the loan.
The implied good faith covenant relates to performance and enforcement of a contract. Section 42a-1-203 of the Uniform Commercial Code provides: "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." (Underlining added). See also 2 Restatement (Second Contracts 209, comment a (1979). Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 566-67
(1984). CT Page 3923
Defendant's assertions of plaintiff's lack of good faith and fair dealing relate to the pre-contract period. While a question exists whether the implied covenant applies during the negotiation phase of a contract, this court, nevertheless, finds defendant has failed to sustain this special defense and counterclaim on its merits.
The defendant was not on welfare at the time of the transaction. Defendant informed Cyr of Equity Lenders that she expected to get a job at SNET and plaintiff had a right to believe her. Defendant also told Cyr she worked as a part-time typist and received $800 a month from her tenant. Thus defendant appeared to plaintiff to have enough income to carry the $900 a month obligation of plaintiff's mortgage.
The implied covenant of good faith and fair dealing is a rule of construction of contracts "designed to fulfill the reasonable expectations of the parties as they presumably intended." Magnan v. Anaconda Industries, Inc., 193 Conn. 558,567 (1984).
The defendant presented herself as desiring the mortgage and capable of paying it. The plaintiff was willing to give the loan and expected to be paid.
On the facts of this case the court finds defendant failed to prove plaintiff acted unfairly or in bad faith.
4. CUTPA Claim
Defendant alleges in the third count of her counterclaim that plaintiff committed an unfair trade practice in violation of 42-110 et seq. in that it failed adequately to verify defendant's ability to pay the mortgage loan and induced defendant to make the loan knowing that she could not pay it.
Courts employ the following criteria in determining whether a practice violates CUTPA: whether it offends public policy as identified by some common law, statutory or other established concept of fairness; whether it is immoral, unethical or unscrupulous. Sanghavi v. Paul Revere Life Ins. Co., 214 Conn. 303, 311-12 (1990).
Under Connecticut law there is no duty that a lender investigate the financial status of a borrower. Conn. National Bank v. Anderson, 6 C.S.C.R. 943, 176 CLT 43 (Nov. 4, 1991, Pickett, J.). The law assumes the lender will act to protect itself against a bad loan. Certainly, the borrower has no claim when the lender relies upon the borrower's representations and does not independently verify them. CT Page 3924
As to defendant's assertion that plaintiff induced defendant to make the loan knowing defendant could not pay it, that could conceivably give rise to a valid CUTPA claim. But here there is no evidence that plaintiff knew defendant could not pay the mortgage and no evidence that plaintiff's intention was to give the loan so it could foreclose on the mortgage and get the property. Rather the testimony was plaintiff abhorred defaulted loans because they reduced its credit at the bank from which it borrowed to invest in mortgages.
The court concludes defendant failed to prove its CUTPA claim.
Thus, the court enters a judgment of foreclosure by sale in favor of the plaintiff, finds the debt to be $84,034.93 as of February 25, 1992, plus a per diem of $29.77 from that date; awards the plaintiff counsel fees of $5,038, an appraisal fee of $525, title fee of $150. The court reappoints Attorney David Rudolf as Committee, sets the sale date for June 13, 1992 at noon, appoints Eric Raiche of Wethersfield as appraiser, and orders: return of appraiser by June 3, 1992; deposit of $16,000 by bidders at the sale but not required of plaintiff if successful bidder; a sign to be placed on premises on May 13, 1992; and committee to obtain liability insurance for the day of the sale.
ROBERT SATTER STATE TRIAL REFEREE