**Ramon PERALTA, Plaintiff,**

v.

**CENDANT CORPORATION,**
**Defendant.**

No. 3:98cv1452 (JBA).

United States District Court,
D. Connecticut.

Sept. 29, 2000.

Daniel H. Kryzanshi, Willinger, Shepro, Tower & Bucci, Bridgeport, CT, for plaintiff.

A. Robert Fischer, Francis P. Alvarez, Maureen Ann Bresnan, Jackson, Lewis, Schnitzler & Krupman, Stamford, CT, James F. Shea, William Joseph Anthony, Jackson, Lewis, Schnitzler & Krupman, Hartford, CT, for defendant.

### *MEMORANDUM OF DECISION*

### *[DOC. # 45]*

ARTERTON, District Judge.

Plaintiff Ramon Peralta ("Peralta") has sued his former employer, Cendant Corporation ("Cendant") for race and gender discrimination in violation of Title VII, and various state law claims. Cendant now moves for summary judgment. For the reasons that follow, Defendant's Motion for Summary Judgment [doc. # 45] is GRANTED in part and DENIED in part. `

## I. FACTUAL BACKGROUND

Viewing the record in the light most favorable to the plaintiff, the factual background to this case is as follows. On October 16, 1995, Defendant Cendant Corporation[1] hired Ramon Peralta to work as a Production Artist in its Advertising Department. Am.Compl. at ¶ 12. Peralta began his employment under the Defendant with approximately three and a half years previous experience in the design, creation and production of computer graphics as a Graphic Artist, a Production Mac Artist, and a Compositor (layout and paste-ups of classified section) for a Connecticut newspaper. *See* Pl.Ex. 13. Peralta remained a production artist under the supervision of Lauren Rachelson for a year. During that time, he received positive feedback from his co-workers and clients regarding his job performance. *See* Pl.Ex. 17. Peralta received a very positive annual review by his manager, Lauren Rachelson. In pertinent part, Rachelson's evaluation stated that Peralta's "excellent communications made everyone aware of logo changes." *See* Pl.Ex. 15. Rachelson also noted that Peralta successfully achieved his personal growth goals and did his best, two standards that Peralta had set for himself in hopes of becoming an Art Director. *Id.* Further, Rachelson observed that Peralta worked independently and put in 100% effort and that she "enjoyed working with [Peralta]." *Id.*

On March 6, 1995, seven months before Peralta began his employment with the Defendant, Marie Leddy, a Caucasian female, was hired as an Associate Production Manager in the Defendant's Advertising Department. Pl.Ex. 12. Leddy had previously worked for year and ten months as an Assistant Print Buyer for a corporation and was responsible for coordinating the print production of projects from the release of the final mechanical on disc through delivery. Pl.Ex. 12. Before that,

Leddy was an Assistant Account Executive at the same corporation for a year and seven months where she was responsible for "trafficking in-house projects" through all of the departments including the Design, Photo, Computer Graphics and Printing Departments. *Id.* In that position, Leddy also gained experience in account budgets and client billing. *Id.*

On March 6, 1996, Leddy's manager, Lenny Portanova, gave Leddy a very positive annual performance review. Pl.Ex. 12. Portanova stated that Leddy's performance was "excellent," her attitude was "positive," and her "execution of [her] responsibilities [was] thorough, accurate, and on time." *Id.* Portanova noted, however, that Leddy could improve by following-up on problems that she identified. *Id.* at 1–2.

On May 24, 1996, Peralta interviewed with Randi Klaber for the position of Art Director in the Creative Group. Am. Compl. at ¶ 16. Klaber told Peralta that he had to be an Associate Art Director before he could be an Art Director. Peralta Dep. at 167. During the interview, Peralta informed Klaber that he was due for a salary increase on the annual review of his work as a Production Artist in the studio department. Peralta Dep. at 131. Klaber responded, "whatever you were going to get for your annual review, we'll give you a little more on top of that." *Id.* Peralta interpreted Klaber's statement as a promise for a raise. Peralta Dep. at 131–32.

On October 15, 1996, approximately a year after he began work at CUC, Klaber promoted Peralta to an Associate Art Director position in the Creative Group. Am.Compl. at ¶ 17. Klaber's e-mail announcing Peralta's promotion stated that Klaber "looked forward to having him join [the Creative G]roup" and that Peralta's "design background and contributions of test ideas ... are clearly aligned with our

---

**1.** At the time that Peralta was hired, the company was called CUC International. CUC International subsequently merged with defendant Cendant Corporation in 1997. *See* Am.Compl. at ¶ 12.

creative needs." Pl.Ex. 11. In a written warning issued to Peralta less than a year later, Klaber stated that in actuality she was "hesitant" about bringing Peralta into the group because he had allegedly made off-premises advancements toward Mucci. Def.Ex. G.

A month previous to Peralta's promotion, Marie Leddy had also been promoted by Klaber to the position of Comp Artist in the Creative Group. Pl.Ex. 12 (Personal Action Notice dated Sept. 9, 1996). Peralta cites this promotion as an example of Klaber favoring women, alleging that Klaber "custom tailored" the Comp Artist position for Leddy in order to bring her into the Creative Group because he believed no such position had previously existed. Pl.Ex. 12; Peralta Dep. at 141, 338. *But see* Klaber Dep. at 171–72 (stating that the Comp Artist position existed in the Creative Department before Leddy was there).

After moving into the Creative Department, Peralta did not get a raise above his expected annual increase and he set up a meeting with Klaber and Vincent Villano, Klaber's supervisor, to discuss unmet raise expectations. Def.Mem. in Supp. at 5; Peralta Dep. at 131. In the meeting, Klaber denied that she promised Peralta a raise. Peralta Dep. at 131. Peralta testified in his deposition that he "would not have taken additional responsibilities and worked hard in the department to move into the position of associate art director if [he] knew it was going to be a lateral move." Peralta Dep. at 132. Peralta cites this as Klaber's first act of discrimination against him, *id.* at 130, based on his belief that Klaber would have given a female in "her group" a raise without question. *Id.* at 132. Peralta also believed that Klaber later held this disagreement against him. Peralta Dep. at 131, 203–204; Def.Ex. H (Peralta Memo to M.J. Dickson dated Aug.

15, 1997—"I feel that this was the beginning of her personal vendetta").

Klaber's "group" was the "Girls' Club," an inner circle based on gender that Klaber had been "building for years" and that she treated in a special manner. Peralta Dep. at 60, 97, 100. The "Girls' Club" consisted of all of the female employees in the Creative Group, with the exception of two women who were in their fifties. Peralta Dep. at 57, 93; Creative Group Employee Chart (circles indicate "Girls' Club" members), Def.Ex. C. The "Girls' Club" was "like a little mafia . . . either you were in or you were out." Peralta Dep. at 60. Members of the "Girl's Club" sat together at company picnics away from the rest of the group, and went out drinking and to clubs together after work. *Id.* at 59. According to Peralta, it was well known within the company that the group was a "clique" and "everybody knew that [Klaber] took care of her own." *Id.* at 59–60. In fact, five out of the six Art Directors in the Creative Group were part of the "Girls' Club." Peralta Dep. at 59.[2]

Peralta was not a member of Klaber's "Girls' Club." Peralta Dep. at 95. As such, Peralta felt he was treated less favorably than the women in the office. One example of such treatment was Klaber's exclusion of Peralta from an advanced training courses. Peralta "wasn't allowed" to take an Illustrator computer class that two women in the Creative Group were permitted to attend. Notes (May 12, 1997), Pl. Ex. 10; Peralta Dep. at 70. Moreover, Leddy, an entry level Comp Artist, was allowed to attend that class whereas Peralta, an Associate Art Director, was not. *Id.* Peralta also believed that he was "unofficially excluded" from a class because the notice of the class did not come around to his cubical, whereas the notice was circulated to two of the female art directors in the department. Peralta Dep. at 82.

---

**2.** Even Pager, the only male Art Director in the Creative Group, was considered an "honorary member" of the "Girls' Club" because he had a "homosexual preference" and there-

fore "got along better with the girls" because he "had more in common with them." Peralta Dep. at 96.

In March of 1997, Peralta experienced the impact of the "Girls' Club" during a disagreement with a female art director, Denise Mucci. Mucci had given a task to Peralta and when Peralta suggested an alternative way to approach it, Mucci publicly "berated" Peralta by responding in an "irate" and "belligerent" manner, "this is what I want you to do[,] so just do it." Peralta Dep. at 73–74. After Peralta and Mucci met with Klaber to resolve the dispute, Klaber called Peralta back into her office and reprimanded him for "putting Mucci in an uncomfortable position" and that he "should have just done what [he] was told instead of trying to resolve the situation." *Id.* at 76. Moreover, Klaber told Peralta that "that's no way to be an [A]rt [D]irector around here" and that he "can't butt heads with other [A]rt [D]irectors or [he] will never be one." *Id.* at 76–77. Shortly thereafter, Peralta spotted Klaber and Mucci together at the mall "just laughing up a storm." *Id.* at 77.

Klaber documented the incident between Peralta and Mucci in a memo that she submitted to the Human Resources Department. *See* Klaber Dep. at 72–73, Pl. Ex. 18, Pl.Ex. 2. In the first sentence of the memo, Klaber wrote, "Ramon's inappropriate behavior in certain situations is forcing me to start documenting these actions because I foresee a trend starting to develop." Memo (Mar. 12, 1997), Pl.Ex. 2. Klaber later stated in her deposition that she wrote the memo so that she would have specific examples of Peralta's behavior if the time ever came when it became an issue in performance evaluations. Klaber Dep. at 73, Pl.Ex. 18.

On May 5, 1997 Peralta submitted his application for the position of Art Director in the Creative Group. Pl.Ex. 8. Three months later, Klaber issued a written warning to Peralta. Def.Ex. G (Written Warning dated Aug. 12, 1997). The warning cited three infractions: inappropriate behavior, the use of company time and equipment for freelance work, and communication problems. *Id.*

Klaber's warning regarding Peralta's behavior cited an inappropriate card that Peralta had created at the request of another employee as a joke. Def.Ex. G; Peralta Dep. at 206. The card contained the photograph of a female co-worker that had been manipulated on the computer. Klaber had never seen the card and she admitted to being unaware of the specifics of why or for what purpose the card was created. Klaber Dep. at 84, Def.Ex. B. According to Peralta, it was common practice for employees from outside the Creative Department to ask Peralta and other artists to create joke cards on the computer as a favor. Peralta Dep. at 206 ("Anyone in the Creative Department was up for grabs for … any kind of photo manipulation …"). Even Vin Villano, Klaber's supervisor, asked Peralta to create "favors" on the computer that Peralta believed could be deemed inappropriate. *Id.*

Furthermore, the first draft of the written warning began with a sentence stating that a sexual harassment charge had been filed against Peralta with Human Resources with respect to his inappropriate behavior towards a female co-worker (the recipient of the card). Pl.Ex. 2 (draft of written warning dated Aug. 12, 1997 with handwritten comments). A review of the report however, reveals that although Peralta's name was mentioned in the co-worker's meeting with Human Resources, the meeting was held to address concerns about inappropriate remarks and attention paid her by another employee, John Tatore. Pl.Ex. 2. The memo contained no indication that the female co-worker wanted to file a charge or a make a complaint against Peralta. *Id.* In fact, the co-worker wanted to resolve the situation on her own by having a conversation with Tatore. *Id.* She made no mention of approaching the subject with Peralta. *Id.*

Klaber's warning also demanded that Peralta remove any other sexually oriented files that existed in the file server or on Peralta's hard drive. Def.Ex. G. Klaber was aware of several female employees in

the Creative Group who sent out sexually oriented e-mails to members of the department, but she did not take any disciplinary action against them. Peralta Dep. at 72.[3]

In support of Peralta's history of "inappropriate behavior," Klaber cited a previous incident where Peralta allegedly made advances towards Mucci. Def.Ex. G. This incident occurred before Peralta was hired into the Creative Group at a bar off company property and after work hours. Def. Ex. G; Peralta Dep. at 358. Moreover, Mucci and Peralta were both embarrassed by the incident and mutually agreed that they had been drinking and that they should both move on and forget the whole thing ever happened. Peralta Dep. at 358. Klaber later learned of the incident through her social relationship with Mucci. *Id.* However, although it did not relate to the workplace, *id.*, Klaber used the incident as an example of a "complaint" that had been "brought to [her] attention." Def.Ex. G.

Peralta's communication skills were also the subject of the August 1997 written warning. Peralta interpreted communication skills to mean talking to and getting along with other people in the department, taking constructive criticism and effectively getting one's point across. Peralta Dep. at 42–43, 53. Although, Peralta did not feel he had a problem with communication or problems with anyone in the department, *id.* at 44, he acknowledged that he could always learn more and agreed to work on his communication skills. *Id.* at 45–46.

As a result of the warning, Klaber put Peralta on probation for a month and suggested that they meet again on September 11, 1997 to discuss Peralta's progress in remedying the problems. Def.Ex. G; *see also* Pl.Ex. 17. However, Klaber warned that if any other performance issues surfaced in the meantime, they might "result

in steps leading to and including termination." Def.Ex. G.

After receiving this written warning, Peralta became concerned that Klaber was intentionally giving him a bad record in order to get rid of him. He wrote a memo to alert Human Resources of this fear. Def.Ex. H. Peralta believed that the warning consisted of "unrelated incidents" brought together "to create a paper trail" which would inevitably lead to his termination. Def.Ex. H (Memo to M.J. Dickson re: Written Warning dated Aug. 15, 1997).

On October 16, 1997, Peralta had his first annual review since he began working in the Creative Group. Pl.Ex. 15 (Annual Performance Review dated Oct. 16, 1997), Def.Ex. D, Def.Ex. I. During this meeting, Peralta applied for the Art Director position again. Peralta Dep. at 169. In the review, Klaber observed that Peralta "had some good marketing ideas" and an "impressive list" of accomplishments that he should be proud of. Annual Performance Review at 1 (Oct. 16, 1997), Pl.Ex. 15, Def.Ex. D, Def.Ex. I. Klaber acknowledged that many people in the department felt that Peralta had "come a long way over the past year" and that Peralta had been trying to improve his relationship with the Art Directors and Copywriters in the department. *Id.* at 3. However, Klaber still expressed reservations about Peralta's communication skills. *Id.* at 2–3. Although Klaber "recognize[d] and appreciate[d][his] extra efforts of late in trying to counteract" the situations that led her to issue the warning, she found it "difficult to map out a long term career course" for Peralta until he fully resolved the communication problems he faced. *Id.* at 3. Moreover, Klaber discouraged another supervisor from promoting Peralta into the supervisor's department by informing her of Peralta's warning (even though he was by then off probation) and "the problems

---

**3.** Klaber was aware of these e-mails and the names of the employees who sent them because at least two of the e-mails were sent to Klaber's e-mail account. Peralta Dep. at 72;

E-mail from Bethany Brereton (Aug. 15, 1997), Pl.Ex. 9; E-mail from Lisa Ebel (Dec. 8, 1997), Pl.Ex. 9.

he was having." Memo re. Klaber Responses to Peralta Statements at 2 (no date), Pl.Ex. 2.

A month later, Klaber promoted Marie Leddy to the Art Director position instead of Peralta. Pl.Ex. 14; Def.Ex. J. Klaber chose Leddy even though Peralta believed he had more experience, was more qualified than Leddy, and had been performing the Art Director's responsibilities as an Associate Art Director.[4] Peralta Dep. at 160; E-mail to M.J. Dickson (Nov. 21, 1997), Pl.Ex. 1. Leddy held an entry level position in the Creative Group and had never been an Associate Art Director. This was a change from Klaber's previous statement to Peralta implying that the Associate Art Director position was a prerequisite for the Art Director position, Peralta Dep. at 167. Furthermore, Leddy had acquired the requisite computer knowledge of the particular programs used in the position just that year. Pl.Ex. 1 (Memo to M.J. Dickson dated Nov. 21, 1997). This was in conflict with the job posting for the Art Director position, which required at least two years of experience using Mac art programs such as Quark Express, Adobe Illustrator, and Photoshop applications. Pl.Ex. 7 (Art Director Job Posting dated June 3, 1996).

In a discussion between Klaber and Peralta regarding Leddy's promotion, Klaber told Peralta that "the decision was not made on a head-to-head comparison." Memo to Peralta (Nov. 21, 1997), Pl.Ex. 2. Klaber stated that she could not consider Peralta for the Art Director position because the position required integrity, sensitivity, and maturity. *Id.* Moreover, Klaber told Peralta that he should not go by the requirements stated in the job postings, but that Peralta should instead pay more attention to "intangibles." Pl.Ex. 1.

Over the next three months, Peralta met with M.J. Dickson in Human Resources and Vin Villano, Klaber's manager concerning Klaber's failure to promote Peralta to Art Director. Peralta Dep. at 246–247. In Peralta's meeting with Villano, Villano acknowledged that "in retrospect it probably wasn't in the best interest to make [Leddy] Art Director without first making her Associate Art Director." Memo to M.J. Dickson (Dec. 23, 1997), Pl.Ex. 1. However, Villano felt that he had to stand behind Klaber's decision. *Id.*

Peralta also sent a memo to M.J. Dickson that summarized the reasons why Peralta felt he should have been promoted over Leddy and informed her that based on the circumstances, Peralta had concluded that Klaber's promotion of Leddy over himself was based on "favoritism with discriminatory intent." Memo to M.J. Dickson (Dec. 23, 1997), Def.Ex. L. Peralta emphasized that he had come to enjoy working at Cendant and wanted to continue to work there, but was finding it "difficult" to do so. *Id.* As such, Peralta proposed three courses of action: (1) a salary increase and a transfer to an Art Director position in Marketing, (2) a salary increase and a promotion to an Art Director position in the Creative Department, and (3) a full investigation by Human Resources into the managerial decision making with regard to posted requirements for the Art Director position (which Peralta claims Leddy does not meet) and six months severance pay. *Id.* On Peralta's second meeting with Klaber, Klaber suggested that he go to Human Resources and "see what [he could] work up." Peralta Dep. at 246. When Peralta met with M.J. Dickson in Human Resources, she presented Peralta with a severance package. Peralta Dep. at 246. Peralta returned to work the next day, February 13, 1998, and received permission from M.J. Dickson in Human Re-

---

**4.** Klaber claims that Leddy had more professional experience to bring to the Art Director position than Peralta. Klaber Dep. at 249, Def.Ex. B. However, defendant presents no direct evidence, other than a general list of Leddy's experience on her job application and resume, of particular aspects of her professional experience that would show how Leddy was thus more qualified for the Art Director position.

sources and Vin Villano to use his vacation week to spend time with his family and consider his options. *Id.* at 300. Before leaving the premises, Peralta wrote a note to himself saying "I quit" which he showed to a co-worker but then threw it in the trash. Peralta Dep. at 293. However, when Peralta left on that day, he still had hopes of resolving the situation and returning to Cendant. Peralta Dep. at 279. He e-mailed Klaber informing her that he didn't quit, that he had secured permission to take a week off, and would return the following Monday. Def.Ex. O.

Upon the advice of his counsel, however, Peralta did not return to work by the defendant's deadline. Peralta believed that since his attorney and Cendant were in negotiations, he still had a job. Peralta Dep. at 303. On March 6, 1998, Peralta's attorney received a letter from the Vice President of Human Resources terminating Peralta's employment from Cendant Corp. Def.Ex. P.

## II. STANDARD

■ Under Federal Rule of Civil Procedure 56(c) summary judgment may be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Genuineness runs to whether disputed factual issues could reasonably be resolved in favor of either party, while materiality runs to whether the dispute concerns facts that can affect the outcome under the applicable substantive law. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 445 (2d Cir.1999) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). "A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial." *Id.*

■ Trial courts must be particularly cautious about granting summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue. *See Chertkova,* 92 F.3d at 87. "[A]s discrimination will seldom mani-fest itself overtly, courts must be alert to the fact that employers are rarely so cooperative as to include a notation the personnel file that the firing or failure to promote is for a reason expressly forbidden by law." *Id.* (citing *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464–65 (2d. Cir.1989)). In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the party opposing the motion. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir.1999) (citing *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998)). However, courts must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. *See id.* This determination should not be made through guesswork or theorization. *See id.* "After all, an inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Id.* (citation omitted). Viewing the evidence as a whole and taking into account all of the circumstances, the court must determine whether the evidence can reasonably and logically give rise to an inference of discrimination. *See id.*

## III. DISCUSSION

### A. Discrimination Claims Under Title VII (Counts One and Two)

■ Peralta alleges that Cendant intentionally and willfully discriminated against him on the basis of his sex and his race in violation of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000(e). The discrimination claims are governed by the three-step, burden shifting paradigm set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *See Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). Under this test, Peralta bears the initial burden of establishing a prima facie case by demonstrating that (i) he is a member of a protected class, (ii) he was qualified for the position, (iii) Cendant took adverse action against Peralta, and (iv) that action occurred under circumstances giving rise to an inference of discrimination. *See Reeves*, 120 S.Ct. at 2106; *Woroski v. Nashua Corp.*, 31 F.3d 105, 108 (2d Cir. 1994). Peralta's burden of establishing a prima facie case is minimal. *See Bickerstaff*, 196 F.3d at 446 (citation omitted). The establishment of a prima facie case creates a presumption that Cendant unlawfully discriminated against Peralta. Once Peralta has successfully proven a prima facie case, the burden then shifts to Cendant to rebut this presumption by producing evidence that Peralta was rejected, or someone else was preferred, for a legitimate or non-discriminatory reason. *See Reeves*, 120 S.Ct. at 2107. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 120 S.Ct. at 2106 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (internal quotations omitted). Cendant's burden of production is not a demanding one; it need only offer an explanation for an employment decision. *See Bickerstaff*, 196 F.3d at 446. Although the burden of production shifts to Cendant at this stage of the analysis, the burden of persuasion always remains with Peralta. *See id.*

■■■ If Cendant satisfies its burden by providing an explanation for a challenged employment action, the presumption raised by the prima facie case is rebutted, and drops from the case. *See id.* Peralta then has the opportunity to demonstrate by a preponderance of the evidence that Cendant's seemingly legitimate explanation was not the true reason for its action, but was a pretext for discrimination. *See Reeves*, 120 S.Ct. at 2106. Although at this stage the presumption of

discrimination has dropped out of the picture, the trier of fact may still consider the evidence establishing Peralta's prima facie case and any inferences generated from that evidence when considering whether the Cendant's explanation is pretextual. *See id.*, 120 S.Ct. at 2106 (citations omitted). Moreover, contrary to the pretext-plus standard that some courts in this circuit have utilized following *Fisher v. Vassar College*, 114 F.3d 1332 (2d Cir. 1997), the Supreme Court held in *Reeves* that it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. *See* 120 S.Ct. at 2108. In other words, "a prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *See id.* at 2109.

### 1. Prima Facie case
#### a. protected class

Peralta brings this action on the basis of gender discrimination because he was discriminated against as a male in an a predominantly female Creative Group, and on the basis of race because Peralta was the only Hispanic employee in the Creative Group. Pl.Mem. in Objection at 14, 21. It is undisputed that plaintiff meets the first element of his prima facie case. *See e.g., Stern v. Trustees of Columbia University in City of New York*, 903 F.Supp. 601, 604 (S.D.N.Y.1995) (white male is member of protected class).

#### b. qualified for the job(s)

■■■ Peralta claims that he was qualified for the coveted job of Art Director. Cendant's written requirements for the Art Director position included a degree in advertising and design, four years of advertising design experience with a portfolio of direct marketing pieces, a record of initiating new advertising ideas and strategies, and two years of computer experience with Macintosh programs such as Quark-Express, Adobe Illustrator and Photoshop.

*See* Art Director Job Posting (June 3, 1996), Pl.Ex. 7; Art Director Classified Ad (Jan. 12, 1997), Pl.Ex. 7. The job also required excellent communication skills. *See id.* Peralta satisfied the education requirement with a Bachelor of Fine Arts degree from the University of Bridgeport. *See* Job Application (Sept. 13, 1995), Pl.Ex. 13; Resume, Pl.Ex. 13. In addition, Peralta had more than five years experience as a computer graphics designer working with the requisite computer software. *See id.* Two of those years were spent within Cendant as a Production Artist in the Advertising Department and as an Associate Art Director in the Creative Department. *See id.* Peralta had a documented record of producing direct mail packages during his two years at Cendant, including a list of accomplishments in the Creative Group which Klaber characterized as "impressive." *See* Annual Performance Review at 1 (Oct. 16, 1997), Pl.Ex. 15, Def.Ex. D, Def.Ex. I. Finally, Lauren Rachelson's review of Peralta after his first year at Cendant indicated that he had "excellent" communications skills. *See* Mem. to Peralta (Oct. 22, 1996), Pl.Ex. 15. Plaintiff's evidence satisfies this element of the prima facie case.

### c. adverse employment action

█ Peralta claims that he suffered adverse employment actions by Cendant. First, Peralta claims that he was passed over for promotion to Art Director in October of 1997 when Marie Leddy was promoted to the position. *See* Pl.Mem. in Objection at 14. Second, Peralta alleges that he was terminated from his employment after complaining that he felt discriminated against by Klaber. *See id.* The record supports that Peralta had applied for the position of Art Director in the Creative Department both through the traditional application process, *see* Employment Application (May 5, 1997), and a verbal application for the position five months later in Peralta's October 1997 performance review, *see* Peralta Dep. at 169, and that Peralta ultimately did not receive the position, *see* Pl.Ex. 14, Def.Ex. J. Plaintiff's evidence clearly demonstrates the adverse employment action of denial of promotion.

█ However the record does not show evidence from which a jury could reasonably conclude that Peralta was fired from his position at Cendant. After Peralta took a vacation week in order to consider his options, he did not return on Monday, February 23, 1998 as agreed. *See* Def.Ex. O. Cendant extended the deadline to February 26, 1998 and then to February 27, 1998, *see* Def.Ex. P, indicating on both of those occasions that if Peralta did not return on the date specified, Cendant would consider his failure to show up for work an indication of his decision to resign from Cendant's employment. Even though Cendant did not approve of Peralta taking a leave of absence beyond the vacation week they granted Peralta, Cendant's Human Resources managers agreed to meet with Peralta and his attorney to see if they could work things out. *See* Letter to Kryanski (Feb. 27, 1998), Def.Ex. P. During that meeting, Peralta and Cendant did not come to an agreement but Cendant extended the deadline of Peralta's return to work until March 5, 1998. *See* Letter to Kryanski (Mar. 6, 1998), Def.Ex. P. When Peralta did not show up for work, Cendant informed Peralta's attorney that they considered him to have resigned from the company. *See id.* Thus, although the burden of proof at the prima facie stage is de minimis, the record contains no evidence disputing that Peralta did not report to work after the extended March 5, 1998 deadline, despite being unequivocally warned of the consequences, and after having secured several extensions. Thus, there is no evidence in the summary judgment record supporting an inference that he was discriminatorily or retaliatorily discharged. In the absence of any evidence from which the jury could find his termination was motivated by unlawful discrimination, summary judgment is properly granted on his discharge claims. Thus,

the only adverse employment action the Court will consider is the alleged discriminatory failure to promote.

#### d. circumstances giving rise to inference of discrimination

 Finally, Peralta asserts that Cendant's failure to promote Peralta occurred under circumstances giving rise to an inference that Leddy's gender was a factor that made a difference in Klaber's promotion decision. Pl.Mem. in Objection at 15. Peralta supports his allegation that Klaber favored women over men by evidence of Klaber's "Girls' Club" that was comprised of the majority of the female employees in the office who socialized together off of company time, *see* Peralta Dep. at 59–60., Klaber's preferential treatment of women by letting two women take a training course that she would not allow Peralta to attend, *see* Notes (May 12, 1997), Pl.Ex. 10; Peralta Dep. at 70., Klaber's disproportionate discipline of Peralta for having sexually oriented files on his computer when she was aware of several women whom were distributing sexual e-mails and did not discipline them, *see* Peralta Dep. at 72, and finally, Klaber's reprimand of Peralta for putting his manager in an "uncomfortable position" when merely trying to communicate a more efficient approach to a task, *see* Peralta Dep. at 76–77. Furthermore, Peralta provides evidence, albeit from his own deposition, that Marie Leddy (a member of the "Girls' Club") was in ways less qualified for the Art Director position and had less experience and a lower job status than himself. *See* Peralta Dep. 132–38; Memo to M.J. Dickson (Dec. 23, 1997), Def.Ex. L.

Taking all inferences from these facts in favor of Peralta and recognizing that his burden at this stage of the *McDonnell Douglas* analysis is de minimis, Peralta has established a prima facie case with respect to a claim for gender discrimination in promotional opportunity for the Art Director position.

In support of his claim of racial discrimination, Peralta asserts that he was the only Hispanic person in the Creative group, all of his co-workers were Caucasian, and they had all been hired by Klaber, who was also Caucasian. *See* Pl.Mem. in Objection at 21. To establish a prima facie case of discriminatory denial of promotion, plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the promotion; (3) he was denied the promotion; and (4) the denial of promotion occurred in circumstances giving rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see also Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991).

 It is undisputed that Peralta meets the first and third prongs of this test, in that he is Hispanic and was passed over for the promotion to art director. Assuming for the purposes of summary judgment that Peralta was equally qualified for the position, the fact that a someone outside the protected class received the promotion instead of him is sufficient for plaintiff to meet his de minimis prima facie burden. *See Lenhoff v. Getty,* 2000 WL 977900 (S.D.N.Y. July 17, 2000) (finding it expeditious to simply concede the existence of a sufficient prima facie case, considering the light burden involved).

#### 2. Defendant's legitimate non-discriminatory reason

Cendant asserts that the reason Peralta was not promoted to the Art Director position was because Klaber believed he had poor design and communication skills. Def.Mem. in Supp. at 22. As to Peralta's design skills, Klaber told Peralta that she did not promote him because she could not trust him to come up with the changes needed to make a piece effective enough to market. *See* Memo Recapping Discussion with Peralta (Dec. 23, 1997), Pl.Ex. 2. With respect to Peralta's communication skills, Klaber told Peralta that she didn't promote him because Peralta lacked listening skills and people in the group were reluc-

tant to go to Peralta for help on projects. *See id.* The *McDonnell Douglas* standard only requires that the Cendant "offer an explanation for [its] employment decision." *see Bickerstaff,* 196 F.3d at 446. Therefore, Cendant has satisfied its burden at this stage of the analysis. *Cf. Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81 (2d Cir.1996) (finding that employer's proffered nondiscriminatory reason for discharging the plaintiff, namely that employee's performance was deficient, was legitimate and sufficient to satisfy its burden in the second stage of *McDonnell Douglas* inquiry).

### 3. Pretext

■ Given Cendant's proffered explanation, it is Peralta's burden to come forward with sufficient evidence from which a jury could reasonably find that Cendant's explanation is pretextual, and that the real reason is unlawful gender preference. The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination. *Reeves,* 120 S.Ct. at 2108.

■ At the summary judgment stage, the Court should not make any finding as to whether Cendant's reason was, in fact, false. Rather, the Court must determine whether, after casting all of the facts of the case in the light most favorable to Peralta and drawing all inferences from those facts in favor of Peralta, a rational jury could come to the conclusion that Cendant's justification for passing Peralta over for the Art Director position was false.

The Second Circuit found sufficient evidence to support a fact-finder's reasonable inference of gender motivated termination sufficient to preclude summary judgment in *Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81 (2d Cir.1996). The plaintiff, a computer programmer, was terminated from the defendant's company allegedly for deficient performance. *See id.* at 92. Over the first ten years of the plaintiff's employment with the defendant, she had positive performance reviews had a "high level of technical competence was widely recognized in within the company." *See id.* at 84. Her performance took a sudden downturn, however, when a new department head took over, and began appointing less qualified males with a record of hostility to women to supervisory positions. The plaintiff was subjected to intensive counseling that male employees were not subjected to, criticized for expressing her opinions and her communication skills, yet denied permission to attend a course in the subject that was offered to all other employees. *Id.* When the plaintiff was assigned a new supervisor and received an excellent performance review, that supervisor was directed to rewrite it because it was "too good." *Id.* Other employees were also solicited for negative information regarding the plaintiff, and soon after the plaintiff suffered a nervous breakdown and did not return to work. *Id.* at 84–85.

From these facts, the Second Circuit found evidence sufficient to permit a rational jury to conclude that the plaintiff was discharged because of her sex. *See id.* at 92–93. The Court's conclusion was based in part on the fact that the plaintiff supplied sufficient evidence, by affidavits deposition testimony of herself and other employees, to support the conclusion that her performance was wholly adequate or even superior. *See id.* at 93. The fact that after the new supervisor's takeover, plaintiff and one other female were discharged for communication issues, while no men were fired during the same period, also supported the court's determination that a jury could find the defendant's justification pretextual. The court concluded that these reasons combined with the alleged threats during the counseling sessions, the required re-write of the plain-

tiff's favorable evaluation, the denial of the plaintiff's request to attend a communication course open to all employees, and the supervisor's refusal to talk about anything but his personal exploits with other women, could lead a factfinder to believe that the plaintiff lost her job because she is female. *See id.* at 93. Accordingly, the *Chertkova* court found that the district court's grant of summary judgment was improper. *See id.*

■ In the case at hand, the defendant has given two explanations for its failure to promote Peralta: Peralta's deficient design skills and his communication problems.

Klaber's primary complaint about Peralta's design skills is that she had to "micromanage" his designs by telling him what changes to make step-by-step. *See* Recap of Discussion Memo (Dec. 23, 1997), Pl.Ex. 2. However, Klaber admits that Peralta's finished product on his projects "is often quite good," *see id.,* and Peralta received many positive comments regarding his work from co-workers and clients throughout his employment in the Creative Group. *See* E-mails, Pl.Ex. 17. In addition, Klaber had reviewed Peralta less than a month prior to her promotion decision, and her review of plaintiff included her favorable observations that Peralta had an "impressive list of accomplishments which [he] should be proud of," that Peralta had submitted ideas showing a "sense of idea generation," and that one of his ideas was "a true marketing breakthrough for the medium." *See* 1997 Annual Review (Oct. 16, 1997), Pl.Ex. 15. Although the review contained several negative comments regarding Peralta's communication skills, it did not criticize his design skills.

The record makes clear that Klaber documented her critiques of Peralta's ability to take constructive criticism and his lack of listening skills during his employment in the Creative Group. In contrast, however, Peralta's first annual review conducted by Lauren Rachelson indicated that Peralta had "excellent communication skills." *See* Annual Performance Review (Oct. 22, 1996), Pl.Ex. 15. In addition, all of the Cendant's documentation that Peralta had communication problems came entirely from memoranda and notes written by Klaber, the same person who Peralta claimed harbored a gender bias against him. Peralta informed Human Resources months before Marie Leddy's promotion to Art Director of his suspicion that Klaber was purposefully creating a "paper trail" of negative feedback in order to ultimately get rid of him. *See* Memo to M.J. Dickson (Aug. 15, 1997), Def.Ex. H. In her deposition, Klaber admits to documenting Peralta's behavior so that she would have specifics when the time came that his performance evaluations were an issue. *See* Klaber Dep. at 73. Defendant does not present any corroborating testimony or documentation from other employees describing similar difficulty with Peralta. Other than the documentation of the dispute between Peralta and Mucci, all of Klaber's references to complaints made by other employees are vague and fail to set out specific instances under which Peralta's co-workers complained about his communication skills. *See* Written Warning dated Aug. 12, 1997, Pl.Ex. 2, Def.Ex. G. ("I've heard many complaints from the Art Directors and Copywriters that you do not listen to constructive criticism"); Annual Review (Oct. 16, 1997), Pl.Ex. 15 ("I've heard this same complaint from AD's and Copywriters Alike"); *Cf.* Klaber Dep. at 71–71 (provides specific examples of employees with whom Peralta had "friction," inferably occurring after Leddy's promotion).

This evidence, while hardly strong, does cast on doubt Klaber's proffered justifications for her employment decision not to promote Peralta. Combined with the evidence discussed above as demonstrating prima facie proof of discrimination, a rational jury could reasonably believe that Klaber created and enjoyed the female dominated atmosphere and comradery of the Creative Group as evidenced by the

"Girls' Club", created a position for Marie Leddy in the Creative Group as a Comp Artist even though such a position had not previously existed, spun events to create an unfavorable record for Peralta, and ultimately promoted one of her "girls" to the Art Director position, despite the fact that Peralta held a higher position in the Creative Group and was more qualified for the job than Marie Leddy. While this is a close case, in that the evidence of her favoritism for her female employees and her motivation for denying plaintiff the promotion is somewhat attenuated, given the evidence of Klaber's personal animus towards plaintiff and her equivocal use of the art director job qualifications, it would not be unreasonable for a rational jury to find that Klaber's actions in denying the promotion to Peralta were in determinative part motivated in part by gender. Accordingly, defendant's motion for summary judgment is denied as to plaintiff's claim that gender discrimination infected the promotion decision.

██ On the other hand, the Court concludes that summary judgment is proper on plaintiff's claim that he was discriminatorily denied the promotion due to his race. The record is devoid of evidence that would allow a jury to conclude that race played a motivating role in Klaber's decision to promote Leddy over him. Although it is true that Peralta was the only Hispanic employee in the Creative Group, *see* Interrogatory # 4 Chart, Pl.Ex. 4, and Klaber hired more than half of the creative group (the others were hired by Lauren Rachelson whose race is unknown), *see id.,* this alone does not suggest discriminatory animus. The Creative Group included less than fifteen employees, *see* Charts of Creative Group, Pl.Ex. 18, and the absence of another minority or Hispanic employee in such a small sample is simply not probative. *See Mayor of City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 621, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (statistics regarding racial composition of thirteen-member school board nominating panel were meaningless); *Pitre v.*

*Western Elec. Co.,* 843 F.2d 1262, 1268 (10th Cir.1988) (sample sizes ranging from two to twenty-four people were too small to produce meaningful use of statistics in discrimination case). Aside from the racial composition of the Creative Group, Peralta fails to submit any other evidence that could give rise to an inference of prejudice or discrimination based on race. The plaintiff has produced no evidence of any incidents, statements or actions that would indicate any racially motivated ill will towards Peralta or any other employee, nor were there a series of promotions for which Peralta was passed over in favor of white employees.

The mere fact that Klaber passed Peralta over one time for a promotion in favor of one white employee, even assuming that Leddy was unqualified and Peralta was qualified, absent any other evidence suggesting any causal connection from which a racial motive could be inferred is insufficient to withstand summary judgment. While *Reeves* holds that evidence of pretext, combined with plaintiff's prima facie case, may be enough for support a finding of discrimination, the Supreme Court reminded the lower courts that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and introduced sufficient evidence to reject the employer's explanation, no rational factfinder could conclude that discrimination had occurred." 120 S.Ct. at 2101. The Court concludes that this is just such a case, in that the mere fact that a white employee was promoted instead of Peralta would not persuade a reasonable jury that he had been discriminated against on the basis of race, even if it disbelieved the reasons given by Klaber. Summary judgment in favor of the defendant will enter as to the entirety of plaintiff's race discrimination claim (Count Two).

## B. State Law Claims

### 1. Negligent infliction of emotional distress

██ Peralta also brings a claim for negligent infliction of emotional distress,

and argues that the evidence in the record is sufficient for a reasonable jury to find the defendant liable under this tort theory. In order to prevail on a claim for negligent infliction of emotional distress in the employment context, the plaintiff must prove that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." *Parsons v. United Technologies Corp.*, 243 Conn. 66, 88, 700 A.2d 655 (1997) (internal citations omitted). While the holding of *Parsons* is limited to a termination context, this Court is of the view that the language of that case must be read against the backdrop of the workers' compensation laws extant at that time, and that such claims have not yet been limited by *Parsons* solely to unreasonable conduct in the termination process. *See Malik v. Carrier Corp.*, 202 F.3d 97 (2d Cir.2000); *see also MacKay v. Rayonier*, 1999 U.S. Dist. LEXIS 21108, 37 (August 31, 1999, D.Conn.). The Court need not decide, therefore, whether Peralta was constructively discharged in order to ascertain whether his negligent infliction claim survives.

In support of his claim that a reasonable jury could find that defendant was unreasonable and that it knew or should have known that its conduct was likely to cause emotional distress, plaintiff points to the following facts. He was attempting to move forward in a career in advertising when he began his employ with the defendant, but Ms. Klaber "deliberately and discriminatorily" began to establish a paper trail to discredit him. Pl.Mem. in Opp. at 24. Plaintiff was threatened with termination in the written warning regarding the harassment complaint, Pl.Ex. 2, and treated as "an outsider to the Creative Group." According to Peralta, Klaber's unreasonable conduct continued when she promoted Leddy, and retaliated against him for complaining. The final evidence supporting his emotional distress claim, plaintiff argues, is that the human resources department offered him a sever-

ance package. Although plaintiff does not include it within his recitation of facts, the Court also notes that after Leddy's promotion, the plaintiff found the work atmosphere so intolerable that he wanted to quit. Peralta Dep. 293.

The Connecticut Supreme Court in *Parsons* emphasized that wrongful termination on its own does not support a negligent infliction claim, and quoted an Oregon Supreme Court case to that effect: "The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." 243 Conn. at 89, 700 A.2d 655, *quoting Madani v. Kendall Ford, Inc.*, 312 Or. 198, 204, 818 P.2d 930 (1991). While *Madani* was a case involving the tort of intentional infliction of emotional distress, the Court will not infer that the state's highest court unmindfully conflated the two standards; rather it appears that the Connecticut Supreme Court heightened the standard for negligent infliction of emotional distress in the employment context. Other courts in this jurisdiction have implicitly reached the same conclusion. *See Pascal v. Alternative Services of Conn., Inc.*, 1998 WL 886540, *2 (Dec. 8, 1998, Conn.Super..) (noting that the Supreme Court's holding in *Parsons* limiting negligent infliction of emotional distress to occasions where the employer's conduct is beyond the boundaries of socially tolerable conduct "is consistent with previous observations that 'courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation' "); *see Cavuoto v. Oxford Health Plans*, 2000 WL 888263, *23–24 (June 22, 2000, D.Conn..) (citing *Parsons* for proposition that there are "specific rules when the alleged [negligent] infliction occurs in the workplace," and concluding that "there was nothing unreasonable or socially intolerable behavior (sic) in the termination of Plaintiff") (internal citations omitted).

 Despite Peralta's arguments to the contrary, the fact that Klaber may

have been motivated in part by his gender does not, in and of itself, make her conduct unreasonable. As made clear by *Parsons* and the cases it cites, it is the conduct of an employer that is subject to scrutiny when a claim is brought under this tort, not the motivation. *See Madani*, 312 Or. at 204, 818 P.2d 930 (employer's motive not relevant to inquiry of whether its conduct exceeded bounds of socially acceptable conduct); *Parsons*, 243 Conn. at 89, 700 A.2d 655 (focusing on the "actions" and "conduct" of the employer).

■■■ Nonetheless, the Court denies defendant's motion for summary judgment on plaintiff's negligent infliction claim. Plaintiff alleges that Klaber purposefully falsified reviews in order to promote a less qualified individual and cause his termination. A court in this district has dismissed on summary judgment similar allegations that the defendant fabricated a paper trail in order to cause the plaintiff's termination, but based its conclusion on its interpretation of *Parsons* as requiring unreasonable conduct on the actual day of termination itself in order to state a claim for negligent infliction. *See Cowen v. Federal Express*, 25 F.Supp.2d 33, 39 (D.Conn. 1998). As discussed above, this Court does not believe the tort is so limited in the employment context. Further, Peralta found Klaber's conduct so intolerable that he considered quitting his employment. The Court is unwilling to find as a matter of law that no reasonable jury could find in his favor no matter how these allegations are developed by evidence at trial.

Final determination of the sufficiency of plaintiff's evidence on this claim must await trial, where the degree and nature of Klaber's conduct can be considered in its full context, and on a Rule 50 motion at the close of plaintiff's case, can be assessed as whether the evidence meets the threshold of unreasonable or unsocially intolerable conduct. At this juncture, however, the motion is denied.

### 2. Breach of implied contract

Plaintiff predicates his implied contract claim on Cendant's "Equal Employment Opportunity—Harassment" policy and written prerequisites for the Art Director position. Pl.Ex. 2, 7. He also claims that Ms. Klaber verbally promised him a raise upon entering his position in her department, and told him that he had to serve as an Associate Art Director before he could assume the position of Art Director, but then promoted Leddy in contradiction of these requirements.

■■■ As defendant notes, the general rule in Connecticut is that "contracts of permanent employment or for an indefinite term are terminable at will." *Torosyan v. Boehringer Ingelheim Pharmaceuticals*, 234 Conn. 1, 14, 662 A.2d 89 (1995). A contract implied in fact, like an express contract, depends on actual agreement, and the party charged must have agreed, either by words or action or conduct, to undertake a contractual commitment to the party seeking to enforce such a commitment. *See Therrien v. Safeguard Manufacturing Co.*, 180 Conn. 91, 94, 429 A.2d 808 (1980). "A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." *Christensen v. Bic Corp.*, 18 Conn.App. 451, 458, 558 A.2d 273 (1989).

■■■ The language of the anti-harassment policy that plaintiff urges as the basis of his implied contract claim does not indicate that defendant is undertaking any contractual obligations towards the plaintiff; rather, it obliges Cendant to comply with federal and state anti-discrimination laws, and to undertake an investigation upon receiving complaints of discrimination and/or harassment. Pl.Ex. 3. Cendant is required to publicize its equal opportunity and anti-harassment policy, as well as the complaint procedure, in order to guard against liability under the discrimination laws. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141

L.Ed.2d 662 (1998). As any promises in the policy are general statements of adherence to the anti-discrimination laws, standing alone they do not create a separate and independent contractual obligation. *See Gally v. Columbia Univ.*, 22 F.Supp.2d 199, 208 (S.D.N.Y.1998) (anti-discrimination policy does not give rise to contractual liability); *Belgrave v. City of New York*, 1999 WL 692034 (E.D.N.Y.) (no breach of contract claim where employee claimed that employer failed to follow its procedures for providing equal opportunity to employees).

The Court also notes that federal policy would not be served by allowing contractual recovery under such policies and procedures, as employers might thus be chary of publicizing and enforcing their complaint procedures. *See Malik*, 202 F.3d at 106 ("The issue here is not the proper balance between employee rights and employer authority under state law. The issue is how to ensure that federal policies are not undermined by imposing on employers legal duties enforceable by damages that reduce their incentives to take reasonable corrective action as required by federal law.")

■■■■ The job description for the Art Director position sought by Peralta similarly does not create any contractual obligations on the part of Cendant.[5] The description outlines the responsibilities and requirements of the art director position. Plaintiff does not specify which portion of this description creates the alleged contractual obligation, and the Court can discern no language in this document which even arguably could be read as Cendant undertaking a contractual commitment to Peralta. The document speaks in terms of Cendant's needs regarding the individual who would ultimately fill the position, but contains no promises or representations regarding any obligation on the part of Cendant. The Court concludes that the job description cannot be an enforceable contract. *See Grich v. Textron Lycoming*, 822 F.Supp. 66 (D.Conn.1993) (human resources policy document providing for the posting of certain salaried positions and procedures for filling such positions internally was not enforceable written contract, but merely guidelines for supervisors). Assuming arguendo that this job description created contractual obligations on the part of Cendant, the Court does not believe the Peralta has standing to enforce it, as he never received the Art Director position and thus would not be a party to the contract, nor does he allege that he is somehow a third party beneficiary. *See Gateway Co. v. DiNoia*, 232 Conn. 223, 654 A.2d 342 (1995) (third party can enforce contract only if parties to the contract intended that the promisor assume a direct obligation to the third party).

■■■■ Plaintiff's final grounds for his alleged contract are the promises ostensibly made by Klaber that he would be given a raise upon entering his position, and that he had to be an Associate Art Director before he could assume the Art Director position. In his deposition, he testified that at his interview with Klaber, she told him that "[w]hatever you were going to get for your annual review, we'll give you a little more on top of that," which he interpreted to mean a raise. Peralta Dep. at 131. He later testified that this conversation was "vague," and that Klaber did not tell him what the increase would be. *Id.* at 343. The Court concludes that such allegations would require the jury to speculate as to what was promised as a raise and are insufficient to demonstrate that there was ever an "actual agreement" between the parties to give Peralta a raise. *See D'Ulisse–Cupo v. Bd. of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987) ("A contract im-

**5.** Presumably, plaintiff bases his contractual claim on the job description that was operative at the time of Leddy's promotion; the only description in the summary judgment record that is within the relevant time frame is the June 3, 1996 posting contained in plaintiff's Exhibit 7, at bate-stamp page 00279.

plied in fact, like an express contract, depends on actual agreement."). Klaber's conduct on this subject may be offered as evidence of pretext or intent, but is insufficiently specific to give rise to an implied contract obligation. As to Peralta's claim that Klaber told him he had to work in the Associate Art Director position before he could be selected as Art Director, plaintiff has failed to demonstrate how this promise was breached, even if it could be considered a contractual obligation. The statement to Peralta expressing the requirements that he individually must meet before assuming the Art Director position could hardly be considered an expression of corporate-wide policy, such that the promotion of Leddy would be a breach.

Plaintiff has failed to demonstrate that defendant assumed any contractual obligations to him, through the EEO policy, the job description, or Klaber's statements to him regarding his future career path at Cendant. Accordingly, defendant's motion for summary judgment on this claim is GRANTED.

### 3. Implied covenant of good faith and fair dealing

■ According to plaintiff's brief, his implied covenant claim is derivative of his implied contract claim, and as such would require dismissal given the Court's determination that no contractual obligations were undertaken by Cendant. Connecticut, however, recognizes that even at-will employment contracts include an obligation to act in good faith and deal fairly with employees. *See Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 479 A.2d 781 (1984). This doctrine has been limited to situations in which the employee was discharged, and where the reason for the discharge involves "impropriety ... derived from some important violation of public policy," *Id.,* 193 Conn. at 572, 479 A.2d 781 (citing *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 475, 427 A.2d 385 (1980)). The Court has concluded that Peralta has not provided sufficient evi-

dence from which a reasonable jury could find that his "termination" was discriminatory or retaliatory, *supra* at 78, nor does he claim that any important policy was violated by his termination.

■ In order to maintain a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must demonstrate "that his discharge violated [an] explicit statutory or constitutional provision ... or ... that his dismissal contravened a judicially conceived notion of public policy." *Morris v. Hartford Courant,* 200 Conn. 676, 680, 513 A.2d 66 (1986). Plaintiff merely claims that Klaber and Dickson were acting in bad faith, and that Klaber intentionally attempted to discredit him. No important public policy of the state of Connecticut is implicated by such allegations. Further, to the extent plaintiff's claim is predicated on his claim that he was denied a promotion on the basis of gender, the Court has denied summary judgment to defendant, and accordingly Mr. Peralta has an adequate statutory remedy. In such a situation, Connecticut courts have held that no contract claims are available. *See Faulkner v. Sikorsky Aircraft,* 11 Conn.L.Rptr. 256, 257 (Super.Ct., April 6, 1994) ("Superior Courts have fairly consistently held that neither a wrongful discharge nor a breach of implied covenant claim are available where ... a plaintiff has adequate statutory remedies through which the alleged public policy violations can be enforced."); *Atkins v. Bridgeport Hydraulic Co.,* 5 Conn.App. 643, 501 A.2d 1223 (1985).

Defendant's motion for summary judgment on plaintiff's good faith and fair dealing claim is GRANTED.

### 4. Promissory estoppel

■ Finally, the Sixth Count of Peralta's complaint alleges a claim for promissory estoppel. There are two essential elements to an estoppel—the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act

in that belief, and the other party influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done. *Reinke v. Greenwich Hospital Assn.,* 175 Conn. 24, 28–29, 392 A.2d 966 (1978). Promissory estoppel provides an alternative that allows enforcement of a promise even without the usual indicia of conventional bargained-for consideration. *Pavliscak v. Bridgeport Hospital,* 48 Conn. App. 580, 592, 711 A.2d 747 (1998). Under Connecticut law, "[a] fundamental element of promissory estoppel . . . is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." *D'Ulisse–Cupo,* 202 Conn. at 213, 520 A.2d 217.

Plaintiff claims that he relied upon Klaber's promise that he would get a raise when he became Associate Art Director, and that he had to be an Associate Art Director before he could become Art Director. He further claims reliance on the Art Director job description discussed above, as well as the EEO harassment policy. As discussed above, the Court finds nothing rising to the level of contractual obligations in the job description and the anti-harassment policy, nor do they constitute a "clear and definite promise" which would reasonably induce reliance. While the harassment policy does promise that an investigation will be undertaken, plaintiff does not predicate his promissory estoppel claim on the failure to conduct such an investigation, nor does he demonstrate how he detrimentally relied upon the promise of an investigation. Rather, both documents are at the most statements of intention or an articulation of company goals and objectives, and cannot give rise to liability under a theory of promissory estoppel.

Plaintiff's claimed reliance on Klaber's promises regarding an anticipated raise and the course of his career path at Cendant, however, is a closer question. Peralta testified in his deposition that he "would not have taken additional responsibilities and worked hard in the department to move into the position of associate art director if [he] knew it was going to be a lateral move," and that he interpreted Klaber's statement "that [he] had to be an associate art director before [he] could become an art director" as a contractual commitment in his mind. Peralta Dep. at 132, 345.

Although the quantity of raise promised by Klaber certainly cannot be considered "clear and definite," the statement's import is that he would receive a larger raise if he transferred to Klaber's group, presumably as an inducement to do so. Peralta testified at his deposition that he assumed extra responsibilities and went above and beyond the requirements of his position in order to make the transfer into the Creative Group and to achieve his goal of becoming Art Director. While his ability to prevail on the theory of promissory estoppel at trial may appear dubious, at this juncture the Court cannot assess the promissory quality of Klaber's language in context or the reasonableness of Peralta's conduct in response to those promises. If at trial plaintiff's evidence appears insufficient, the Court will revisit the issue on a Rule 50 motion. Accordingly, summary judgment on plaintiff's promissory estoppel claim is denied.

## IV. CONCLUSION

For the reasons outlined above, Defendant's Motion for Summary Judgment [doc. # 45] is GRANTED as to that portion of Count One alleging discriminatory termination, and the entirety of Count Two (Race Discrimination), Count Four (Implied Contract), and Count Five (Implied Covenant of Good Faith and Fair Dealing). Defendant's Motion for Summary Judgment [doc. # 45] is DENIED, however, as to plaintiff's claim that he was denied the art director promotion on the basis of his

gender, and Count Three (Negligent Infliction of Emotional Distress), and Count Six (Promissory Estoppel).

IT IS SO ORDERED